# NORTHERN NATURAL GAS CO. *v.* STATE CORPORATION COMMISSION OF KANSAS.

No. 62. Argued December 13, 1962.—
Decided February 18, 1963.

*Mark H. Adams* argued the cause for appellant. With him on the briefs were *Lawrence I. Shaw, F. Vinson Roach, Mark H. Adams II* and *Joe Rolston.*

*Charles C. McCarter* argued the cause for appellee. With him on the brief was *Hugh B. Cox.*

*Solicitor General Cox, Acting Assistant Attorney General Guilfoyle, Ralph S. Spritzer, Richard A. Solomon, Howard E. Wahrenbrock* and *Arthur H. Fribourg* filed a brief for the Federal Power Commission, as *amicus curiae.*

Briefs of *amici curiae,* urging affirmance, were filed for the State of Texas by *Will Wilson,* Attorney General, and *Linward Shivers,* Assistant Attorney General; for the State of Alabama by *MacDonald Gallion,* Attorney General; for the State of Colorado by *Duke W. Dunbar,* Attorney General; for the State of Georgia by *Eugene Cook,* Attorney General; for the State of Illinois by *William G. Clark,* Attorney General; for the State of Louisiana by *Jack P. F. Gremillion,* Attorney General; for the State of Mississippi by *Joe T. Patterson,* Attorney General; for the State of Montana by *Forrest H. Anderson,* Attorney General; for the State of Nebraska by *Clarence A. H. Meyer,* Attorney General; for the State of Nevada by *Charles E. Springer,* Attorney General; for the State of New Mexico by *Earl E. Hartley,* Attorney General; for the State of North Dakota by *Leslie R. Burgum,* Attorney General; for the State of Oklahoma by *Mac Q. Williamson,* Attorney General, and *Ferrell Rogers;* for the State of Utah by *A. Pratt Kesler,* Attorney General; for the State of Wyoming by *W. M. Haight,* Acting Attorney General; and for the Mid-Continent Oil & Gas Association by *W. W. Heard.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question in this case is whether orders of the Kansas State Corporation Commission which require the

appellant, an interstate pipeline company, to purchase gas ratably from all wells connecting with its pipeline system in each gas field within the State [1] invalidly encroach upon the exclusive regulatory jurisdiction of the Federal Power Commission conferred by the Natural Gas Act, 15 U. S. C. §§ 717–717w.

The appellant's pipeline system is connected to some 1,100 natural gas wells in the Kansas Hugoton Field [2] under about 125 purchase contracts between the appellant and various producers. The contracts have been duly filed with the Federal Power Commission. Under the

---

[1] The general order of the Commission, which was embodied in Rule 82–2–219, provided:

RATABLE PRODUCTION OF GAS FROM COMMON SOURCE OF SUPPLY

"In each common source of supply under proration by this Commission, each purchaser shall take gas in proportion to the allowables from all the wells to which it is connected and shall maintain all such wells in substantially the same proportionate status as to overproduction or underproduction; provided, however, this rule shall not apply when a difference in proportionate status results from the inability of a well to produce proportionately with other wells connected to the purchaser (Authorized by G. S. 1959, Supp. 55–703; Effective February 8, 1960)."

This order, directed generally at all purchasers within the Commission's jurisdiction, superseded an order of October 7, 1959, which specifically required appellant "to take gas ratably from all wells to which it is connected in the Kansas Hugoton Gas Field." When the general order was promulgated, the specific order was rescinded. The Kansas Supreme Court, however, considered the validity of both orders as though both were still in force. For purposes of our jurisdiction and consideration of the merits, it makes no difference whether the specific order survived, for the superseding general order was no less clearly directed at the appellant.

[2] For a history of the discovery and development of the Hugoton Field, and the Kansas Commission's earlier efforts to insure correlative rights in, and to regulate the taking of gas from, that field, see generally American Bar Association Section of Mineral Law, Conservation of Oil and Gas—A Legal History, 1948 (1949), 165–183.

oldest contract, known as the Republic "A" contract, which was made in 1945 with Republic Natural Gas Company, and is still in force as modified in 1953, appellant was obligated to purchase gas from Republic up to the maximum production allowables for Republic's Kansas wells connected to appellant's system.[3]   Appellant's contracts with its other producers provide that appellant's purchase commitments thereunder are expressly subject to the agreement with Republic.   Thus appellant was bound to purchase from its other producers only so much of its requirements as were not satisfied by the quantities which the Republic contract required to be taken from Republic wells.

Appellant's requirements until 1958 were such that its purchases from its various producers were nevertheless roughly ratable, that is, in like proportion to the legally fixed allowables for each of the 1,100 wells in the Hugoton Field.   However, after 1958 appellant's requirements aggregated substantially less than the total allowables for the Hugoton wells.[4]   Thus the balance of the total

[3] The original Republic "A" contract, as amended, fixed the minimum-take requirements in terms of a percentage of appellant's natural gas needs for a particular district which it served from the Hugoton Field.   A decision of the Kansas Supreme Court in 1952 modified that term of the contract by holding that appellant's takes from particular Republic wells could not exceed the production allowables set by the Commission for those wells, regardless of whether the total allowables might be lower than the percentage stipulated by the contract.   *Northern Natural Gas Co.* v. *Republic Natural Gas Co.*, 172 Kan. 450, 241 P. 2d 708.

[4] The substantial underages in appellant's purchases were attributed to two factors: First, the rate of increase in the allowables for the wells from which appellant was taking had exceeded the increases in appellant's requirements from the Hugoton Field; and second, appellant's projected expansion of its system had been delayed unexpectedly by failure to secure the requisite certificates of convenience and necessity from the Federal Power Commission.   Neither factor is material to the questions presented by this appeal.

requirements, after the contractually required purchases from Republic of the maximum allowables for the Republic wells, resulted in appellant's purchases from appellant's other producers of proportions substantially below the allowables for those producers' wells. This imbalance brought about the orders of the State Commission of which appellant complains.

A Kansas statute [5] empowers the State Commission so to "regulate the taking of natural gas from any and all . . . common sources of supply within this state as to prevent the inequitable or unfair taking from such common source of supply . . . and to prevent unreasonable discrimination . . . in favor of or against any producer in any such common source of supply." The Commission adopted in 1944, avowedly as a conservation measure, a basic proration order designed to effect ratable production and to protect correlative rights in the Hugoton Field.[6] In 1959, in order to require appellant to take gas from Republic wells in no higher proportion to the allowables than from the wells of the other producers, the Commission entered the order specifically directing appellant to

[5] The statute, as amended in 1959, is Kan. Gen. Stat., 1949 (Supp. 1959), § 55–703, captioned "Production regulations; rules and formulas." The terms of the statute speak of "taking" rather than "purchasing" of natural gas; the Commission has decreed that the two terms are synonymous. It was the view of the dissenting judge in the court below, however, that the "taking" comprehended by the statute, nowhere defined in the statute itself, referred only to *production* so that the Commission lacked authority under state law to regulate *purchasing* in the manner of the present orders. See 188 Kan. 355, 365, 362 P. 2d 599, 606.

[6] The operative clause of this order designated the order as the basic guide for "the production of natural gas" from the Hugoton Field. No provisions of the order imposed enforceable obligations or sanctions upon purchasers, although one section admonished, ". . . purchasers . . . from any well, shall endeavor to limit their takes of gas to the quantities fixed in the schedule as the allowable production for such well . . . ."

purchase gas ratably from all 1,100 Hugoton wells. That order was superseded in February 1960 by the general order, directed at all natural gas purchasers taking Kansas gas. These orders presented the appellant with the alternatives of complying with the obligations of the Republic contract and increasing its takes from the other producers' wells—thus taking more gas from Kansas than it could currently use—or of risking liability for a breach of the Republic contract by decreasing its takes from the Republic wells below the allowables.[7]

Appellant challenged the two orders in the Kansas courts on the ground, among others, that they unconstitutionally invaded the exclusive jurisdiction of the Federal Power Commission under the Natural Gas Act. The Kansas Supreme Court sustained the orders, 188 Kan. 351, 355, 362 P. 2d 599, 609; on rehearing, 188 Kan. 624, 364 P. 2d 668. We noted probable jurisdiction of an appeal to this Court, 370 U. S. 901. We disagree with the Kansas Supreme Court, for we hold that the State Commission's orders did invade the exclusive jurisdiction which the Natural Gas Act has conferred upon the Federal Power Commission over the sale and transportation of natural gas in interstate commerce for resale.

I.

We consider first the ground relied upon by the Kansas Supreme Court, that the orders constitute only state regulation of the "production or gathering" of natural gas, which is exempted from the federal regulatory domain by the terms of § 1 (b) of the Natural Gas Act, 15 U. S. C. § 717 (b). These orders do not regulate "production or gathering" within that exemption. In a line of decisions beginning with *Colorado Interstate Gas Co.* v.

---

[7] Pending in a Kansas trial court are two suits by Republic against appellant to recover damages for appellant's failure to purchase gas in the quantities required by the contracts.

*Federal Power Comm'n,* 324 U. S. 581, 598, and *Inter-state Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 689–693, it has been consistently held that "production" and "gathering" are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution. See *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, 680–681; *Continental Oil Co.* v. *Federal Power Comm'n,* 266 F. 2d 208; *Huber Corp.* v. *Federal Power Comm'n,* 236 F. 2d 550. Appellant is not a producer but a purchaser of gas from producers, and none of its activities in Kansas shown upon this record involves "production and gathering, in the sense that those terms are used in § 1 (b) . . . ." [8] *Phillips Petroleum Co.* v. *Wisconsin, supra,* at 678.

## II.

The Kansas Supreme Court also sustained the orders on the ground that neither order threatened any actual invasion of the regulatory domain of the Federal Power Commission since it "in no way involves the price of gas." 188 Kan., at 624, 364 P. 2d, at 668. It is true that it was settled even before the passage of the Natural Gas Act, that *direct* regulation of the prices of wholesales of natural gas in interstate commerce is beyond the constitutional power of the States—whether or not framed to achieve ends, such as conservation, ordinarily within the ambit of state power. See *Missouri* v. *Kansas Natural Gas Co.,* 265 U. S. 298; cf. *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83. But our inquiry is not at an end because the orders do not

---

[8] Thus we have no need to consider the effect of the "production or gathering" exemption upon ratable-take orders directed exclusively at independent producers of natural gas. For contrasting views on that question, compare Kelly, Gas Proration and Ratable Taking in Texas, 19 Tex. Bar J. 763, 797 (1956), with Comment, Ratable Taking of Natural Gas, 11 S. W. L. J. 358, 360–361 (1957).

deal in terms with prices or volumes of purchases, cf. *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 478. The Natural Gas Act precludes not merely *direct* regulation by the States of such contractual matters. See *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 506–509. The Congress enacted a comprehensive scheme of federal regulation of "all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." [9] *Phillips Petroleum Co.* v. *Wisconsin, supra,* at 682; see H. R. Rep. No. 709, 75th Cong., 1st Sess. 2.

The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, *Natural Gas Pipeline Co.* v. *Panoma Corp.,* 349 U. S. 44, or for state regulations which would indirectly achieve the same result.[10] These state orders necessarily deal with matters which directly affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regu-

---

[9] Persistent efforts to narrow the scope of the broader exclusive federal jurisdiction conferred by the statute have been unavailing. See, *inter alia,* H. R. 4051, 80th Cong., 1st Sess.; H. R. 4099, 80th Cong., 1st Sess.; H. R. 1758, 81st Cong., 1st Sess.; and S. 1498, 81st Cong., 1st Sess. "Attempts to weaken this protection [of consumers against exploitation at the hands of natural-gas companies] by amendatory legislation exempting independent natural-gas producers from federal regulation have repeatedly failed, and we refuse to achieve the same result by a strained interpretation of the existing statutory language." *Phillips Petroleum Co.* v. *Wisconsin, supra,* at 685.

[10] Our decisions in *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.,* 340 U. S. 179, and *Phillips Petroleum Co.* v. *Oklahoma,* 340 U. S. 190, are not contrary. "In those cases we were dealing with constitutional questions and not the construction of the Natural Gas Act." *Natural Gas Pipeline Co.* v. *Panoma Corp., supra,* at 45.

lation which was an objective of the Natural Gas Act. They therefore invalidly invade the federal agency's exclusive domain.

The danger of interference with the federal regulatory scheme arises because these orders are unmistakably and unambiguously directed at *purchasers* who take gas in Kansas for resale after transportation in interstate commerce. In effect, these orders shift to the shoulders of interstate purchasers the burden of performing the complex task of balancing the output of thousands of natural gas wells within the State, cf. *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340—a task which would otherwise presumably be the State Commission's. Moreover, any readjustment of purchasing patterns which such orders might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States. This relationship is a matter with respect to which Congress has given the Federal Power Commission paramount and exclusive authority. See *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610. The prospect of interference with the federal regulatory power in this area is made even more acute by the fact that criminal sanctions imposed by state statute for noncompliance fall upon such purchasers and not upon the local producers. Therefore, although collision between the state and federal regulation may not be an inevitable consequence, there lurks such imminent possibility of collision in orders purposely directed at interstate wholesale purchasers that the orders must be declared a nullity in order to assure the effectuation of the comprehensive federal regulation ordained by Congress.

It may be true, as the State Commission urges, that accommodation on the part of the Federal Power Commission could avoid direct collision—but this argument

misses the point. Not the federal but the state regulation must be subordinated, when Congress has so plainly occupied the regulatory field. Cf. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236. We have already said that the question to be asked under this statute is "whether state authority can practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." *Federal Power Comm'n* v. *Transcontinental Gas Pipe Line Corp.,* 365 U. S. 1, 19–20.

## III.

Appellee's principal contention, sustained by the Kansas Supreme Court, is that ratable taking is essential for the conservation of natural gas, and that conservation is traditionally a function of state power. There is no doubt that the States do possess power to allocate and conserve scarce natural resources upon and beneath their lands. We have recognized such power with particular respect to natural gas. *Patterson* v. *Stanolind Oil & Gas Co.,* 305 U. S. 376; *Bandini Petroleum Co.* v. *Superior Court,* 284 U. S. 8; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300. But the problem of this case is not as to the existence or even the scope of a State's power to conserve its natural resources; the problem is only whether the Constitution sanctions the particular means chosen by Kansas to exercise the conceded power if those means threaten effectuation of the federal regulatory scheme.

We have already held that a purpose, however legitimate, to conserve natural resources, does not warrant *direct* interference by the States with the prices of natural gas wholesales in interstate commerce, *Cities Service Gas Co.* v. *State Corporation Comm'n,* 355 U. S. 391; *Michigan Wisconsin Pipe Line Co.* v. *Corporation Comm'n,* 355 U. S. 425. It has been suggested that those decisions are at variance with *Champlin Refining*

*Co.* v. *Corporation Comm'n,* 286 U. S. 210, in which we sustained a state proration order designed to further conservation, against a challenge under the Commerce Clause.[11] We reject that suggestion. The Court in *Champlin* carefully limited that holding to regulations which, the Court observed precisely, "apply only to *production* and *not to sales or transportation* of crude oil or its products." (Italics supplied.) The Court further noted, "[s]uch *production* is essentially a mining operation and therefore is not a part of interstate commerce . . . ." 286 U. S., at 235. (Italics supplied.) And, after enactment of the Natural Gas Act, in confirming state power to achieve conservation objectives, the Court took care to say, "[t]hese ends have been held to justify control over *production* even though the uses to which property may profitably be put are restricted." *Cities Service Gas Co.* v. *Peerless Oil & Gas Co., supra,* at 185–186. (Italics supplied.) Thus our cases have consistently recognized a significant distinction, which bears directly upon the constitutional consequences, between conservation measures aimed directly at interstate purchasers and wholesales for resale, and those aimed at producers and production. The former cannot be sustained when they threaten, as here, the achievement of the comprehensive scheme of federal regulation.

Of course, the Kansas method before us would fail, for the reasons given, even if it were Kansas' only means of attaining these ends. The State does not, however, appear to be without alternative means of checking waste and disproportionate or discriminatory taking.[12] More-

[11] See American Bar Association Section of Mineral and Natural Resources Law, Conservation of Oil and Gas—A Legal History, 1958 (1960), 342.

[12] See, *e. g., Colorado Interstate Gas Co.* v. *Federal Power Comm'n, supra,* at 602–603; cf. *Patterson* v. *Stanolind Oil & Gas Co., supra.* The availability of regulatory alternatives, particularly

over, the invalidation of this particular form of state regulation does not result in a regulatory "gap" of the sort which the Act was designed to prevent. *Phillips Petroleum Co.* v. *Wisconsin, supra,* at 682–683. For example, we have very recently recognized that the Commission can and should take appropriate account of cer-

in the form of proration and similar orders directed at producers, has been much discussed. See the view of a member of the Kansas Corporation Commission, Byrd, Contractual and Property Rights as Affected by Conservation Laws and Regulations, Tenth Annual Institute on Oil and Gas Law and Taxation, 1, 6–7 (1959); see also American Bar Association Section of Mineral Law, Conservation of Oil and Gas—A Legal History, 1948 (1949), 170–171; Kulp, Oil and Gas Rights (1954), § 10.100; 1 Kuntz, Treatise on the Law of Oil and Gas (1962), § 4.7.

It has been urged that as a practical matter restrictions upon purchasers more effectively and easily achieve ratable taking, see 1A Summers, Oil and Gas (1954), 139 and n. 9.30. On the contrary, it has also been argued that the very objectives sought to be achieved here may be achieved through ratable production orders, Comment, Ratable Taking of Natural Gas, 11 S. W. L. J. 358, 359, 362 (1957). We note too the suggestion of a witness in the proceeding below that the result sought by the orders herein might have been achieved by requiring Republic to decrease production from its wells rather than by requiring appellant to increase its purchases from those wells. R. 33. This apparently was also the view of the dissenting judge below, 188 Kan., at 365, 362 P. 2d, at 606. See, as to the obligation of the States to pursue alternatives which avoid interference with federally protected interstate commerce, *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354–356.

There is no occasion to consider appellant's further argument that the Kansas Commission's orders were tainted by an improper motive, that is, to require overproduction of Kansas Hugoton wells in order to prevent disadvantageous drainage to Texas and Oklahoma, which share the Hugoton Field with Kansas. The relevancy of motive to the validity of such regulations has been questioned, *Stephenson* v. *Binford,* 287 U. S. 251, 276. See, however, *Thompson* v. *Consolidated Gas Utilities Corp.,* 300 U. S. 55, 69–70, where the Court invalidated a state proration order "shown to bear no reasonable relation either to the prevention of waste or the protection of correlative rights . . . ."

tain conservation factors in certification proceedings. *Federal Power Comm'n* v. *Transcontinental Gas Pipe Line Corp., supra,* at 20–22. See also McGrath, Federal Regulation of Producers in Relation to Conservation of Natural Gas, 44 Geo. L. J. 676 (1956).

## IV.

Although what we have said answers the question for decision, it is appropriate that we comment upon a suggestion advanced both by appellant and by the Federal Power Commission as *amicus curiae.* That suggestion was that if we should hold, as we do hold, that the orders invalidly invade the federal regulatory jurisdiction, the judgment should not be reversed but the case should rather be remanded to the Kansas Supreme Court. The theory is that the Kansas Supreme Court might, in light of our holding, now hold that the orders effected a modification of the Republic "A" contract such as to permit performance of the contract through takings from the Republic wells in such lower amounts as may be necessary to achieve ratability with the takings from the wells of appellant's other producers. In short, the suggestion is that the state court, if afforded the opportunity, might now so harmonize the Republic contract with the Commission's order that there would result no measurable effect upon interstate transmissions or sales.

We reject this suggestion for several reasons. First, both opinions of the Kansas Supreme Court show that the court clearly recognized the substantiality of the federal question in the asserted encroachment of the orders upon the federal regulatory scheme. The court squarely decided the federal question in favor of the validity of the orders. Neither opinion rests this holding on an independent nonfederal ground of decision, and the appellant and the Commission, by suggesting a remand, in effect concede as much. Nor is there any undecided

aspect of the case upon which the Kansas Supreme Court might still sustain the orders upon a nonfederal ground. Cf. *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95.   We and the Kansas Supreme Court are therefore in complete agreement that the federal question as to the validity of the orders cannot be avoided.   It would hardly be seemly for us to ask the Kansas Supreme Court to reconsider its holding because we have reached a different conclusion on that question.

Furthermore we have difficulty perceiving how we could properly invite the Kansas Supreme Court to interpret the Republic "A" contract in light of the orders with a view to possible abatement of the federal question. That contract was not in any respect made an issue in this lawsuit—indeed, Republic is not a party; the controversy is solely between the appellant and the State and concerns only the validity of the orders.   To invite consideration by the Kansas Supreme Court of the possible accommodation of the contract with the orders so as to avoid the asserted invalid trespass on the federal regulatory area, is necessarily to ask the Kansas court to do one of two things: (1) to determine whether the orders can be accommodated with a contract which is in no sense before the court and in the absence of one of the contracting parties; or (2) to vacate its holding that the orders are not invalid for encroachment on the federal domain, and abstain from deciding that question pending the decision of some action which may squarely pit the contract against the orders.   In the circumstances, to follow the suggestion to remand would on our part be highly irregular.

In any event the suggestion misconceives the true nature of the question which the Kansas Supreme Court and this Court were called upon to decide.   The federal question does not arise from an asserted actual and immediate conflict between the federal and state regulations.

The question is whether the state orders may stand in the face of the pervasive scope of federal occupation of the field. Cf. *San Diego Building Trades Council* v. *Garmon, supra,* at 241–244. Indeed, even if the issue of the accommodation of the Republic "A" contract with the orders had been actually framed in the lawsuit, the mere fact that the Kansas court might make the suggested accommodation would not necessarily permit the Kansas court or this Court to avoid decisions of the federal question, since even then it would have to be determined whether the orders invalidly jeopardize the Natural Gas Act's objective of uniformity. See *Federal Power Comm'n* v. *Transcontinental Gas Pipe Line Corp., supra,* at 28. For, if the federal question could be avoided or postponed just short of actual collision, by *ad hoc* accommodation on the part of every State, then the scope of federal regulatory power would vary in accordance with the kaleidoscopic variations of local contract law.

The judgments are reversed and the causes are remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART and MR. JUSTICE GOLDBERG join, dissenting.

The conflict asserted between the Kansas Commission's "ratable take" orders and the authority of the Federal Power Commission is that by virtue of the combined effect of such orders and the minimum "take or pay" provisions of Northern's Republic "A" contract the consumer price of Northern's gas sold in interstate commerce will be forced up, thereby potentially embarrassing the Federal Power Commission's effective exercise of its authority over

such prices.[1]   The premise of this alleged conflict is of course that Northern's Republic "A" contractual obligations remain unaffected by the Kansas Commission's ratable take orders.

The appellee Commission says that even if all this be correct its orders are nonetheless valid.  The Federal Power Commission as *amicus,* while denying this conclusion, says, however, that no significant conflict with federal authority would arise if the effect of the State Commission's orders is to abrogate take or pay provisions such as those contained in the Republic "A" contract, and suggests that the case be remanded to the Kansas Supreme Court for determination of that question of state law.  This would obviate the necessity of our deciding at this time any questions of federal law.

Without intimating any view upon the federal questions,[2] it seems to me that the Federal Power Commis-

---

[1] These effects, as claimed by the appellant and the Federal Power Commission, are summarized in the appellee's principal brief on this appeal (p. 26) as follows: "To comply with the Kansas orders by taking ratably in the Kansas Hugoton Field, appellant, it is argued, would have to do one of two things: (1) increase its takes from its other connections in the field until they become ratable with its takes from the Republic A wells, or (2) continue to take the same amount from the field as a whole but reallocate its takes so as to make them ratable by decreasing takes from Republic to a figure below the amount provided by the contract and increasing takes from other wells.  It is contended that the first of these courses would require appellant either to take from the Kansas Hugoton Field gas which it does not want and for which it has no present market or to reduce its takes in other fields and thereby incur contractual liability to producers in those fields, and that the second would result in contractual liability to Republic.  Either course, it is argued, will necessarily cause an increase in the price of gas to the ultimate consumer, and for this reason the Kansas orders are inconsistent with the Natural Gas Act."

[2] At the 1958 Term the Court dismissed for want of a substantial federal question an appeal presenting substantially the same broad

sion's suggestion is an obviously sensible one. Cf. *Northern Natural Gas Co.* v. *Republic Natural Gas Co.,* 172 Kan. 450, 241 P. 2d 708. The Court's opinion, as I understand it, gives three principal reasons for refusing to remand: (1) the State Commission's orders are in any event invalid *per se* because they bear upon *purchasers* and not *producers* of natural gas; (2) even if Northern were no longer bound by the quantity obligations of its Republic "A" contract, the Kansas orders would still be invalid because they require Kansas purchasers who previously took gas unratably to readjust their purchasing patterns, which might possibly affect ultimate consumer prices; and (3) the Kansas Supreme Court in fact reached and decided the federal questions and, apart from that, there are other reasons that would make remand a "highly irregular" course. I can see little or nothing in any of these objections to remand.

## I.

That the Kansas orders are directed at purchasers should not be allowed to obscure their true nature. The production of natural gas and its movement into interstate channels constitute one and the same physical operation. Thus the Kansas orders limiting the volume of gas a pipeline may purchase from a given well are tantamount to a limitation on the production of that well. Indeed an order directed to the purchaser of the gas rather than to the producer would seem to be the most feasible method of providing for ratable taking, because it is the purchaser alone who has a first-hand knowledge as to whether his takes from each of his connections in the field are such

federal question which the Court decides today. See *Permian Basin Pipeline Co.* v. *Railroad Comm'n,* 358 U. S. 37 (reported below at 302 S. W. 2d 238; and see the Jurisdictional Statement in this Court, No. 64, Oct. Term, 1958).

that production of the wells is ratable.[3]   An order addressed simply to producers requiring each one to produce ratably with others with whose activities it is unfamiliar and over whose activities it has no control would create obvious administrative problems.[4]

There is thus no warrant for concluding that just because the Kansas orders read "purchaser" rather than "producer" they are an attempt to regulate the interstate sale of natural gas.   Their purpose and effect are to limit production—the physical act of drawing gas from the earth.   To the extent, then, that appellant's operations control the volume of gas produced, they involve "production and gathering, in the sense that those terms are used in [the] § 1 (b)" exemption of the Natural Gas Act. *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 678.

But regardless of whether the § 1 (b) exemption is applicable here, the orders do not necessarily invade areas reserved to exclusive federal authority.[5]   The mere fact

---

[3] Most of the more important oil and gas producing States have long had statutes providing for ratable taking by *purchasers* to protect correlative rights.   See Tex. Stat. Ann., Tit. 102, Art. 6049a, §§ 8, 8a (enacted in 1931); Okla. Stat. Ann., Tit. 52, § 240 (enacted in 1915); La. Rev. Stat., 1950, Tit. 30, §§ 41–46 (enacted in 1918).

[4] In these circumstances the situation here is hardly comparable to one in which a State has attempted to impose upon a foreign corporation, not doing business in the State, liability for the collection of a use tax with respect to goods purchased by residents of the taxing State at a store of the corporation located in the State of its domicile. See *Miller Bros. Co.* v. *Maryland*, 347 U. S. 340.   Surely the Natural Gas Act was not intended to relieve interstate pipelines doing business in a particular State from the mere mathematical computation involved in ratably distributing its over-all need for natural gas among the producers with which it has business connections in that State.

[5] As this Court noted in *Federal Power Comm'n* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 8: ". . . Congress, in enacting the Natural Gas Act, did not give the Commission comprehensive powers

that they are directed at purchasers does not, of itself, interfere with the Federal Power Commission's functions of certification (§ 7 of the Act) or rate regulation (§§ 4 and 5 of the Act).[6]  And I find it hard to reconcile the Court's holding on this score with its statement that "conservation measures aimed directly at interstate purchasers . . . cannot be sustained *when they threaten, as here,* the achievement of the comprehensive scheme of federal regulation." *Ante,* p. 94.  (Emphasis added.) As will be shown (*infra,* pp. 103–106), this threat, if it exists at all in this case, is no different from that flowing from other valid conservation measures.

The Federal Power Commission itself acknowledges that if the Kansas orders release appellant and others from contractual obligations of the sort in question here, then such orders would entail no significant conflict with federal authority.  The Commission states: "In that event, despite the fact that the Kansas regulation is in terms addressed to interstate pipeline companies rather than to Kansas producers, we would not urge that it so impinged upon matters of national, as opposed to local, concern, or that it so interfered with the regulatory functions and purposes of the Federal Power Commission under the Natural Gas Act, as to require its invalidation under the supremacy clause."[7]  For the further reasons that will now be discussed, I think this is a perfectly sound position.

---

over every incident of gas production, transportation and sale. Rather, Congress was 'meticulous' only to invest the Commission with authority over certain aspects of this field, leaving the residue for state regulation."

[6] That criminal penalties for noncompliance are imposed on purchasers adds nothing to the fact that the orders are addressed to purchasers.

[7] Memorandum for the Federal Power Commission as *amicus curiae,* pp. 21–22.

## II.

Of course a remand is unnecessary if, as in the Court's view, the Kansas Commission's orders are invalid even though appellant is deemed to be no longer bound by the take or pay provisions of the Republic contract. But the remote possibility of an adverse effect on the cost structures of Kansas purchasers falls far short of establishing such invalidity.

The ratable take orders here were intended as conservation measures [8]—to protect the correlative rights of producers taking gas from a common source of supply by preventing drainage from underproduced wells to overproduced wells.[9]  It has always been recognized that the States possess the power to conserve scarce resources such as natural gas and to prevent unfair and discriminatory production of this resource by some wells at the expense of others.  See, e. g., Patterson v. Stanolind Oil & Gas Co., 305 U. S. 376; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61; Ohio Oil Co. v. Indiana, 177 U. S. 190. It is difficult to imagine any exercise of this conservation power that would not carry with it the possibility of affecting the costs incurred by those who purchase gas from producers.  Regulations requiring the casing of wells, prohibiting the use of pumps, restricting production to a certain percent of a well's "open flow," imposing a particular gas-oil ratio, controlling drilling operations

---

[8] The Court disclaims any need to consider the contention that the true purpose of the Kansas orders was to require overproduction of the Kansas part of the Hugoton Field in order to prevent its drainage into Texas and Oklahoma (ante, pp. 94–95, note 12).

[9] When one well in a common pool produces a large volume of gas, the pressure is reduced at that point; the gas in the common pool then tends to flow toward the low pressure point, thereby reducing the amount of gas available for production by other wells.

and pipeline pressure, prescribing the permissible spacing of wells, and enforcing pooling or unitization may reduce the amount of gas available for sale by a particular producer (at least in the short run) and thus force a purchaser to buy from it or someone else probably at greater cost. Yet it has never been suggested that such state measures are for that reason invalid.

Indeed, the most direct interference with the availability of gas for interstate sale is the "allowable" order. It places a ceiling on the amount of gas that may be produced by a particular well during a given period of time and inevitably makes pipelines spread their demand among many wells. Obviously its possible effect on cost is precisely the same as that which may be caused by a ratable take order, for the two orders are merely variations of the same regulatory measure; both are designed to prevent the disproportionate taking of gas from some wells to the disadvantage of others.

In *Champlin Refining Co.* v. *Corporation Comm'n,* 286 U. S. 210 (1932), this Court sustained, against a challenge under the Commerce Clause, a state allowable order. Since the States had the power to issue such an order at the time the Natural Gas Act was passed, nothing in that Act can now be considered to withdraw it. This is so because it is beyond dispute that when Congress enacted the Natural Gas Act in 1938 it did not intend to deprive the States of any regulatory powers they were then deemed to possess under the Constitution. Rather, the Act was intended only to fill the "gap . . . thought to exist at the time the Natural Gas Act was passed" by providing for federal regulation of those aspects of the natural gas business that the States were at that time believed to be constitutionally incapable of regulating. *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, 684, 685–687. As was specifically stated in the House Com-

mittee Report, the Act "takes no authority from State commissions, and is so drawn as to complement and in no manner usurp State regulatory authority." H. R. Rep. No. 709, 75th Cong., 1st Sess., p. 2.[10]

If an allowable order is now valid, what is the distinction between such an order and the ratable take orders in the present case? The Court points to no difference in terms of effect on cost structure, but only to the fact that the orders here are directed at purchasers and not producers. For reasons already discussed, *supra,* pp. 100–102, this difference is illusory.

Quite apart from the absence of any significant difference between the possible general cost ramifications of an allowable and a ratable take order, the very facts of the case before us demonstrate the folly of determining whether or not the jurisdiction of the Federal Power Commission has been invaded on the basis of general possibilities unsupported by specific data. Appellant is paying a higher price for gas to Republic than to any other producer in the Kansas Hugoton Field. If appellant could reduce its take from Republic wells without contractual liability, the over-all cost of its gas purchases would in all likelihood decrease. Surely such a beneficial effect on appellant's cost structure is not inconsistent with the purposes of the Natural Gas Act. And we have no way of knowing the extent to which the same is true of other Kansas purchasers. The lurking danger of collision with federal regulation that the Court fears may be completely nonexistent. Yet on this insecure founda-

---

[10] See also *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 517 ("The Act, though extending federal regulation, had no purpose or effect to cut down state power"); *Federal Power Comm'n* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, 502–503, 512–513; *Interstate Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 690.

tion the Court builds a rule that, if consistently applied, may well destroy the conservation powers of the States. And this in the name of an Act expressly intended to preserve existing state powers.

## III.

The Court's remaining arguments against remand are equally unsatisfactory.

It is said that the Kansas Supreme Court did not rest its decision on a state ground (the abrogation, by virtue of the Commission's orders, of Northern's take or pay obligations under the Republic contract), but decided the federal questions. Whatever may have prompted the state court to this course—perhaps a desire to obtain from this Court a broad decision on the federal question or a mistaken belief as to the irrelevancy of the contract question to the existence of the state power now questioned—this surely does not constrict the grounds of our adjudication of the case. It is familiar practice for this Court to refuse to reach federal constitutional questions on which the state courts have predicated decision. It is enough to refer to the landmark concurring opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346–348, enumerating principles designed to avoid the unnecessary adjudication of constitutional questions—a tenet of adjudication to which this Court has always strictly adhered.

A remand, it is also said, would be a "highly irregular" step for the further reasons that the effect of the State Commission's orders on the Republic "A" contract was not drawn in question in this suit and the Republic Company itself was not a party to the litigation. However, in light of what has already been said the germaneness of that contract issue to the question of the validity of state power in the premises is apparent. And apart from the presumed availability of state procedures for the

vouching into the case of the Republic Company, we are informed by the Federal Power Commission that there is now pending in the state courts another case against Northern, to which Republic *is* a party, that involves the continuing validity of the take or pay provisions of the "A" contract.[11] Hence, if necessary, the Kansas Supreme Court could on remand of the present case hold its hand pending resolution of the contract issue in the other litigation.

In short, I cannot understand why this Court should not remand for determination of a state law issue that may dispose of this case, as the Court has done in other comparable instances. See, *e. g., Leiter Minerals, Inc.,* v. *United States,* 352 U. S. 220, 228–230; *Aquilino* v. *United States,* 363 U. S. 509, 515–516.

I would vacate the judgments of the Supreme Court of Kansas and remand the case to that court for a determination, in accordance with Kansas procedures, as to the effect of the State Commission's orders on the Northern-Republic "A" contract.

---

[11] *Republic Natural Gas Co.* v. *Northern Natural Gas Co.,* Nos. 4165 and 4235, District Court of Stevens County, Kansas, in which, we are told, Republic claims damages from Northern for failure to observe the take or pay provisions of the "A" contract.