The **PUBLIC SERVICE COMMISSION OF WEST VIRGINIA**, Petitioner,

v.

The **FEDERAL POWER COMMISSION** and Mountain Gas Company, a corporation, Respondents.

**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS**, Petitioner,

v.

**FEDERAL POWER COMMISSION,** Respondent.

Nos. 14606, 14609.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1970.

Decided Feb. 16, 1971.

John E. Lee, Charleston, W. Va., Chief Counsel, Public Service Commission of W. Va., Leo Catsonis, Sp. Asst. Atty. Gen., and Paul Rodgers, Gen. Counsel, National Assn. of Regulatory Utility Commissioners (Chauncey H. Browning, Jr., Atty. Gen., and Augustine A. Mazzei, Jr., Charleston, W. Va., Atty., Public Service Commission of W. Va., on brief), for petitioners.

Israel Convisser, Atty., F. P. C. (Gordon Gooch, Gen. Counsel, Peter H. Schiff, Sol., and George Lewnes, Asst. Gen. Counsel, F. P. C., on brief), for respondent.

Sherman S. Poland, Washington, D. C. (Bernard A. Foster, III, and Ross, Marsh & Foster, Washington, D. C., Boyd D. Taylor, Charleston, W. Va., and Roy Schaeffer, Charleston, W. Va., on brief), for Mountain Gas Co.

Before SOBELOFF, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

In this case we must decide if the Federal Power Commission (FPC), in exercising its jurisdiction, was required to condition its approval on concurrent approvals by a state regulatory commission.

Before its partial reorganization, Cabot Corporation (Cabot) was engaged in a number of related business activities having to do with the exploration, production, transmission and sale of natural gas in intrastate and interstate commerce in West Virginia and the Southwest. Various activities were subject to regulation by FPC and the Public Service Commission of West Virginia (PSC), or both.

Cabot determined to reorganize certain of its West Virginia operations which were subject to dual regulation. It caused the creation of two wholly-owned subsidiaries: Appalachian Exploration & Development, Inc. (AED) and Mountain Gas Co. (Mountain). Basically, Cabot determined that AED would perform the production function for obtaining natural gas and Mountain would perform the transmission and selling functions to certain of Cabot's customers for further transportation and resale in interstate commerce. To that end, Cabot transferred its Rocky Fork production leases to AED, and it plans to transfer other producing properties to AED, which will also conduct new explorations. Cabot leased to Mountain certain of its West Virginia pipeline facilities, which Cabot agreed to operate for Mountain. Mountain contracted to make interstate sales to two interstate pipelines, one of which was formerly a customer of Cabot, of gas to be supplied by AED and another independent producer. Mountain will also sell a small quantity of gas to Cabot for service to Cabot's local customers.

To effectuate these realignments, Cabot then sought FPC's approval of an exemption from federal jurisdiction, under § 1(c) of the Natural Gas Act, 15 U.S.C.A. § 717(c), of the portion of its distribution sales within West Virginia which it had formerly performed in conjunction with the sales which would be made by Mountain. In FPC Docket CP 68–176 the exemption was granted upon a condition not relevant here, and the

time for judicial review has expired. Although Cabot thus removed itself from some FPC regulation, AED is subject to FPC regulation as an independent producer.

In FPC Docket CP 68–303 Mountain applied, under § 7(c) and (e) of the Natural Gas Act, 15 U.S.C.A. § 717f(c) and (e), for a certificate of public convenience and necessity to acquire the facilities leased to it by Cabot, to make interstate sales to certain of Cabot's former customers, and to sell a small quantity of gas to Cabot for service to Cabot's local customers located in the vicinity of the leased facilities. Cabot's and Mountain's applications were consolidated. PSC and National Association of Regulatory Utility Commissioners (NARUC) intervened in opposition, arguing that under West Virginia law, Cabot's transfer of leases to AED and Cabot's lease of pipeline facilities to Mountain were invalid because PSC had not authorized the transactions. Hence, PSC argued, Mountain was not "able \* \* \* to perform the service proposed" as required by the statute and should not be granted a certificate of public convenience and necessity, because its right to employ the facilities needed to transport gas was in doubt, as was the availability of an adequate supply of gas from AED. The examiner rejected these arguments, and the Commission adopted his findings and issued the certificate.

Upon petition for review, filed by PSC and NARUC under § 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b), the same contentions are pressed. We conclude to affirm FPC's order.

## I

First, we turn to the argument that Mountain lacks an adequate supply of gas because the transfer of gas leases to AED, its principal supplier, was invalid.

In determining whether Mountain should be granted a certificate of public convenience and necessity, the trial examiner considered in detail the adequacy of its gas supply. He made the ultimate finding that Mountain had met its burden of establishing possession of a supply of gas adequate to meet the demands of the proposed project and this was supported by subsidiary findings. The examiner found that Mountain would require gas reserves of approximately 48,-000,000 Mcf to supply its customers over a ten-year period. Against this requirement, the examiner found that Mountain had a commitment for 38,000,000 Mcf of gas from the Rocky Fork Field, where AED has its leases; it anticipates receipt of the remaining 10,000,000 Mcf from other producers; and it "has a call" upon AED's additional undedicated reserves in the approximate amount of 14,-500,000 Mcf.

AED's commitments to Mountain are, of course, dependent in the first instance upon the validity of Cabot's transfers to AED. But any argument that AED might not be relied on to meet its obligations, and thus that Mountain lacked an adequate gas supply, was met by a back-up agreement between Cabot and Mountain whereby Cabot agreed to dedicate "whatever interest it may have in such leases [those transferred by Cabot to AED] to the fulfillment of Appalachian's [AED's] obligations" to Mountain. With regard to this agreement, the examiner found:

> By the letter agreement, Cabot is obligated to fulfill AED's obligations to Mountain in the event that the transfers involved "be set aside or nullified." There are adequate means to assure compliance with such obligations. Furthermore, there is no reason to believe that such obligations will not be honored. Whether the supplier be AED or Cabot, under its agreement to Mountain, the latter has the assurance of an adequate gas supply.

FPC, both in its opinion and order affirming the examiner's decision and in its order confirming its original opinion and order after rehearing, adopted the examiner's findings.

We think the finding, which we have determined to have substantial evidentiary support, is dispositive of this issue. It is, therefore, unnecessary to determine if some of the leases transferred from Cabot to AED were "undeveloped" so as to admit the possibility of some permissible PSC regulation. FPC was required only to consider the adequacy of Mountain's gas supply to furnish the service which it sought authority to render. If Mountain was assured of an adequate supply, even from alternative sources, FPC need have inquired no further.

## II

Next, we turn to the question of Cabot's lease of pipeline facilities to Mountain.

Prior to the time that Cabot leased the pipeline to Mountain, the pipeline had been certificated to Cabot by FPC for use in interstate commerce. At the time approval was sought for the transfer, apparently some intrastate customers were being served by the facilities. The transfer from Cabot to Mountain was accomplished by two steps involving the regulatory process. First, FPC granted permission to Cabot to abandon the use of interstate facilities under § 7(b) of the Natural Gas Act, 15 U.S.C.A. § 717f (b). This permission was an outgrowth of FPC Docket CP 68–176, in which Cabot sought exemption from federal jurisdiction, wherein FPC had conditioned the grant of exemption upon the filing of an application to abandon. The application to abandon was subsequently filed by Cabot and granted by FPC. Second, Mountain's acquisition of the pipeline, as lessee from Cabot, was authorized in the grant of a certificate of public convenience and necessity in the present case, FPC Docket CP 68–303. These steps accomplished the transfer of a pipeline dedicated in part to interstate use from Cabot to Mountain, the interstate character of the use being undisturbed and continuous. No intrastate use of the pipeline was to be carried on by Mountain, but testimony indicated that Cabot would continue to use the line occasionally, to serve local customers, supplying gas sold to it by Mountain.

PSC, nevertheless, contends that the transfer was ineffective because it had not granted Cabot approval for the transfer. Its authority to regulate is set forth in the margin.* It argues that Cabot is a public utility and that Cabot's lease of a part of its pipeline is literally within the statute. Recognizing the problem of preemption by federal law, PSC argues that there is a strong Congressional policy against invalidating state regulatory schemes and that there

---

* West Virginia Code of 1961, § 2562(2) provides in pertinent part:

Unless the consent and approval of the public service commission of West Virginia is first obtained: * * * (c) no public utility subject to the provisions of this chapter, except railroads other than street railroads, may assign, transfer, lease, sell, or otherwise dispose of its franchises, licenses, permits, plants, equipment, business or other property or any part thereof; but this shall not be construed to prevent the sale, lease, assignment or transfer by any public utility of any tangible personal property which is not necessary or useful, nor will become necessary or useful in the future, in the performance of its duties to the public; * * * (f) no public utility subject to the provisions of this chapter, except railroads other than street railroads, may, by any means, direct or indirect, enter into any contract or arrangement for management, construction, engineering, supply, or financial services or for the furnishing of any other service, property or thing, with any affiliated corporation, person or interest.

* * * * *

Every assignment, transfer, lease, sale or other disposition of the whole or any part of the franchises, licenses, permits, plants, equipment, business or other property of any public utility, or any merger or consolidation thereof and every contract, purchase of stock, arrangement or other transaction referred to in this section made otherwise than as hereinbefore provided shall be void to the extent that the interests of the public in this State are adversely affected, but this shall not be construed to relieve any utility from any duty required by this section.

is here no conflict between West Virginia's public utility regulatory statute and the Congressional scheme of regulation embodied in the Natural Gas Act. It contends that state regulation here is justified by the state's interest in assuring that Cabot realize reasonable compensation in its arrangement with Mountain, and by the danger that Cabot might "shift beneficial revenues and tax savings to its nonregulated affiliates and escape flowing them through to benefit West Virginia utility customers." Although Cabot may be a public utility within the meaning of the West Virginia statute, we disagree that PSC may exercise its regulatory authority here.

▉ In granting Mountain a certificate of public convenience and necessity, FPC acted under § 7(c) and (e) of the Act, 15 U.S.C.A. § 717f(c) and (e). That section requires FPC to grant the certificate "if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed" and that "the proposed service * * * is or will be required by the present or future public convenience and necessity * * *." Nowhere in that section, or elsewhere in the Act, is found any provision which requires FPC to act jointly with a state utility commission, or to condition its grant of authority or approval upon the action of a state regulatory body, in the respects with which we are concerned.

The Supreme Court has never formulated a clear test to determine precisely what areas in the natural gas industry are left open to state regulation. During the period 1944–1951 the Court decided four cases making it clear that the states could regulate the *production* of natural gas and its direct sale to local users. F. P. C. v. Hope Nat. Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (dictum); Panhandle E. Pipe Line Co. v. P. S. C., 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); F. P. C. v. Panhandle E. Pipe Line Co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949); Panhandle E. Pipe Line Co. v. Michigan P. S. C., 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed.

993 (1951). In each of these cases, explicit provisions of § 1 of the Natural Gas Act, 15 U.S.C.A. § 717 were relied on. However, some of the opinions contained broad language with respect to the intent of Congress to leave much state regulation unimpaired. For example, in the 1947 *Panhandle* case the Court stated that the Act "does not contemplate ineffective regulation" at either the state or the federal level and went on to emphasize the significance of the interests of the individual states in regulation in that case. This implied to some extent that an interest-weighing process would be applied.

In the most recent case, Northern Natural Gas Co. v. State Corp. Commission of Kansas, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), the Court held that Kansas could not require an interstate transporter of gas to comply with an order requiring purchasers to purchase ratably among the Kansas wells to which they were connected. The Court said: "[t]hese state orders necessarily deal with matters which directly affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act. They therefore invalidly invade the federal agency's exclusive domain." 372 U.S. at 91–92, 83 S. Ct. at 650–651. The Court stated that "[n]ot the federal but the state regulation must be subordinated, when Congress has so plainly occupied the regulatory field." 372 U.S. at 93, 83 S.Ct. at 651.

We think that the principles stated in the *Northern Natural Gas* case govern this case. The subject with which we are concerned is the right to transport and to sell gas in interstate commerce. The right to acquire and the right to operate an interstate pipeline is an essential adjunct thereto. Under the Act, these matters are committed to the jurisdiction of the FPC. As the FPC has recently pointed out in a case involving the transfer, abandonment, and construction of

various interstate pipelines, any requirement of local utility commission approval, in addition to FPC approval, would create confusion. Cumberland & Allegheny Gas Co., 43 FPC 275 (1970). See also First Iowa Hydroelectric Cooperative v. F. P. C., 328 U.S. 152, 164–170, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). If the acquisition of rights in an interstate transportation line were subject to the veto of every state regulatory agency along the line, a single agency could seriously impair interstate commerce and the interests protected by the Act and prevent FPC from performing its statutory duties.

■ We conclude, therefore, that the exercise of federal authority to sanction an interstate transaction of this nature cannot be made dependent upon approval by a state regulatory commission. It follows that PSC's purported regulatory authority has been superseded and cannot be exercised.

### III

■ Although the issue is largely irrelevant to their jurisdictional assertions, PSC and NARUC attack Cabot's reorganization of its West Virginia operations on the grounds that it is a means for Cabot (acting through Mountain, its wholly-owned subsidiary) to sell gas at 30¢ per Mcf to its former interstate customers when formerly it charged a lesser figure. This was the view of the dissenting member of FPC in its decision below, but we do not find that the record supports the argument.

Mountain contracted to purchase its gas principally from AED at an average cost of 27¢ per Mcf. It transports the gas and resells it at 30¢ per Mcf. Mountain, in addition to undertaking to pay rent to Cabot for the transmission facilities, will pay Cabot to service and operate the pipeline. Nonetheless, as the findings of the trial examiner demonstrate, neither Cabot nor Mountain will realize excessive earnings. Indeed, Mountain's total expenses will exceed its revenues, but the excess will be borne by Cabot and not by Mountain's customers:

### C. *Economic Feasibility.*

The evidence supports the conclusion that the project is economically feasible. The essential economic ingredient of the Mountain project is the lease agreement between Cabot and Mountain, pursuant to which the facilities to render the proposed service have been leased. * * * Under the leasing agreement, Mountain is required to pay Cabot a flexible annual lease charge for use of the facilities, calculated to be $144,916 in the first year of operation. Such lease charge is designed to recover a maximum amount based upon a 7% rate of return on net investment, an accrual for depreciation of 2% on transmission plant, 2.5% on field lines, and 3% on field measuring and regulation stations; plus accrual for state and Federal taxes and reasonable and necessary costs attributable to plant devoted to the service. Cabot has also contracted to provide all labor, material and supplies as well as all administrative services and management, including accounting, engineering and legal services, for a service charge of $78,-186. Mountain's total operating and maintenance expenses, amounting to approximately $118,000 including allocated administrative and general expense will be paid to Cabot. While the estimated total lease charges would exceed the estimated gas sales revenues, the maximum charges so computed are limited to Mountain's sales revenues, less its other operating revenue deductions. Based upon estimated sales and revenues, *the effect of the lease charge will result in the equating of Mountain's cost of service to its income.* The project depends economically upon the three-cent price spread between the average purchased gas cost of 27 cents per Mcf and the sales price of 30 cents per Mcf. However, *the three-cent price spread will be insufficient to recoup the full lease charge.* It is estimated that the revenues will be sufficient, however, to cover annual operation and maintenance charges,

plus a lease charge sufficient on an incremental basis to pay out the costs of the project in approximately four years. It appears that *the mechanism of the flexible lease charge would protect the purchasers over the life of the project. Any failure to recoup the maximum lease charge will be absorbed by Cabot and its stockholders.* (emphasis supplied.)

If the trial examiner's findings, adopted by the FPC, are not a full answer to the contention, two other comments are in order. First, AED's basic price of 27¢ per Mcf was established in other dockets (CI 68–1298, CI 68–137 and CI 69–118) which were pending while the order under review was being formulated. Neither PSC nor NARUC elected to intervene in those proceedings and the rate was fixed without opposition. Second, we were told in oral argument by FPC counsel that FPC has subsequently granted an area rate increase in Appalachian and Illinois Basin Areas, Docket No. R–371 which would be applicable to Cabot were it to make the sales made by Mountain directly, and that this order would permit Cabot to make sales at not less than 30¢ per Mcf.

For these reasons, FPC's order is Affirmed.