**GULF OIL CORPORATION**

v.

**TENNECO, INC.**

Civ. A. No. 83–2714.

United States District Court,
E.D. Louisiana.

May 13, 1985.

Milton L. Duvielh, New Orleans, La., A. Randall Friday, Houston, Tex., for plaintiff.

Robert K. Reeves, Lafayette, La., for defendant.

## ORDER

ROBERT F. COLLINS, District Judge.

This matter is presently before the Court on motions of defendant, Tenneco, Inc., to dismiss for failure to state a claim, for lack of subject matter jurisdiction, for failure to join indispensible parties, and to stay these proceedings pending referral to the Federal Energy Regulatory Commission (FERC) of certain issues within the FERC's primary jurisdiction or exclusive jurisdiction.

Tenneco's motion to dismiss for failure to state a claim, which Tenneco asserted but did not argue in its supporting memoranda, is hereby DENIED, because it appears that Gulf's complaint does indeed state a claim upon which, at the appropriate time, relief can be granted. Tenneco's motion to dismiss for lack of subject matter jurisdiction is also DENIED, except as to any issues within the FERC's exclusive jurisdiction, because there is complete diversity of citizenship and more than $10,000.00 in controversy. Obviously, the Court lacks subject matter jurisdiction over any issues within the FERC's exclusive jurisdiction. However, the Court does have subject matter jurisdiction over all other issues arising in this litigation, including those issues referred to the FERC under the primary jurisdiction doctrine. The Court will reserve its ruling on Tenneco's motion to dismiss for failure to join indispensible parties, until the FERC resolves the issues referred to it. Finally, the Court finds merit in Texaco's motion to stay, and, accordingly, these proceedings are hereby STAYED pending resolution of the following five issues, expressed in the form of interrogatories, that are hereby REFERRED to the FERC:

(1) What are the causes of the severe imbalance between the gas supplies deliverable to Tenneco under its gas purchase contracts with various producer-suppliers

and the ability of Tenneco's markets to absorb such gas at current price levels?

(2) Should Tenneco's prepayments to Gulf for gas not taken by Tenneco, pursuant to contractual take-or-pay provisions, be considered in determining if Gulf's contract prices exceeded applicable NGPA price ceilings? If so, did any of Gulf's contract prices exceed applicable NGPA price ceilings?

(3) What is the nature and extent of Gulf's performance obligations under any certificates of public convenience and necessity, issued by the FERC pursuant to the NGA, obligating Gulf to provide service to Tenneco?

(4) Did Gulf reduce its deliveries of NGPA § 104 gas, 15 U.S.C. § 3314, to Tenneco? If so, did such reduction constitute a de facto unauthorized abandonment of service, which is prohibited by NGA § 7(b), 15 U.S.C. § 717f(b)?

(5) Which party, Gulf or Tenneco, has the power to nominate by NGPA category the proportional volumes of gas that will be bought or sold pursuant to the contracts at issue herein?

By specifying the particular issues that are referred to the FERC, the Court does not intend to restrict unduly that agency's ability to assist the Court. The FERC is free, and is urged, to make all findings that it believes will aid the prompt resolution of this dispute.

## REASONS

### I. *Facts and Contentions*

On April 29, 1983, Gulf, a producer and supplier of natural gas, was notified that Tenneco,[1] one of its gas purchasers, was unilaterally abrogating various provisions of its gas purchase contracts. Under the terms of its Emergency Gas Purchase Policy (EGPP), Tenneco suspended, or substantially modified in its own favor, contractual provisions concerning price, deliveries, take-or-pay, nomination of gas categories, and other related matters. Tenneco's EGPP is that company's response to an increasingly severe imbalance between the gas supplies deliverable to Tenneco under its gas purchase contracts with various producers and suppliers, and the ability of Tenneco's markets to absorb natural gas at current price levels. Contributing to this imbalance, and to Tenneco's problems, were the economic recession of 1981–82, the market distortions caused by the pricing scheme of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301 *et seq.*, the world-wide glut of crude oil, which resulted in a drop in the price of this competing fuel, and the extremely mild 1982–83 winter heating season in Tenneco's market areas. This combination of adverse factors caused Tenneco to abrogate unilaterally its gas purchase contracts with various producers and suppliers, including Gulf, in order to avoid losing an ever increasing share of its market for natural gas sales. Thus, in Tenneco's opinion, any provision in any of its gas purchase contracts that was contrary to the EGPP would have to be suspended. In particular, Tenneco is concerned with take-or-pay and pricing provisions, and category nomination rights under its gas purchase contracts.

Prior to Tenneco's EGPP, the take-or-pay provisions contained in the gas purchase contracts between Gulf and Tenneco required Tenneco either to take delivery of a specified quantity of gas, usually expressed as a specific percentage of a well's deliverability, or, if the specified quantity of gas is not taken, to prepay for a stated percentage of that gas.[2] In addition, the take-or-pay provisions provided a make-up right that allowed Tenneco a period of time in which to take delivery on the gas paid

---

1. Although Tenneco is the named defendant, the gas purchase contracts at issue involve one of Tenneco's divisions, Tennessee Gas Pipeline Co.

2. For example, the Moncrief Contract, one of the contracts at issue here, contains a take-or-pay percentage of 80 percent of deliverability of the gas wells involved. *Plaintiff's Exhibits in*

*Support of Memorandum in Response to Defendant's Motion to Dismiss (Plaintiff's Exhibits)*, Exhibit B at ¶ 1.2. Under the take-or-pay provisions, if Tenneco takes only 50 percent of a gas well's deliverability, then Tenneco must pay Gulf for the 50 percent taken as well as for the 30 percent of deliverability not taken.

for but not received under the take-or-pay provisions.[3] However, the severe imbalance between deliverability of gas to Tenneco and the ability of Tenneco to market that gas, which imbalance is projected to persist for the next several years,[4] will cause Tenneco to have excessive take-or-pay obligations for a period of time exceeding the make-up period, thereby rendering the make-up right essentially useless. Under its EGPP, Tenneco seeks to alleviate the harshness of the take-or-pay provisions by, *inter alia,* reducing the applicable take-or-pay percentages, requiring refunds at the end of the make-up period for any gas paid for but never taken, and refusing to recognize its take-or-pay obligation under contracts with producers and suppliers who refuse to acquiesce in these EGPP amendments to those contracts.[5]

In addition to the take-or-pay modifications, Tenneco's EGPP purports to impose a unilateral price reduction and to specify the quantities of gas from each NGPA category[6] that Tenneco will purchase pursuant to the contracts at issue. Through the EGPP, Tenneco unilaterally lowers the price of gas in its contracts containing no market-out provision to the maximum lawful price or, if there is no maximum price, to "110% of the No. 2 fuel oil" index published by FERC.[7] Through the EGPP, Tenneco also unilaterally assumes the right to specify the volume of gas in each NGPA pricing category that Tenneco will purchase from Gulf. Prior to the EGPP, according to Gulf, each of the subject contracts gave Gulf the sole discretion and right to operate its wells and leases in such manner as Gulf deemed advisable, and none of the contracts contained any provi-

**3.** The Moncrief Contract contains a two-year make-up period. *Id.* at ¶ 2.1.

**4.** For a detailed discussion of, *inter alia,* the adverse economic consequences (such as the present imbalance facing Tenneco) of phased deregulation of the natural gas industry, which is dominated by long-term contracts confected under a formerly pervasive regulatory scheme, see Pierce, *Natural Gas Regulation, Deregulation, and Contracts,* 68 Va.L.Rev. 63 (1981). Dean Pierce correctly predicted many of the adverse consequences that the natural gas industry is presently experiencing as a result of the interaction of long-term contracts confected under a pervasive regulatory scheme and phased deregulation. He predicted as follows:

> First, gas will be available generally at a supermarket price for several years during and after the process of phased deregulation. This will cause a reduction in aggregate social welfare through the process of substitution of higher-cost alternatives for gas. Second, demand for gas will be so dampened by the supramarket price that unfortunate secondary dislocations are likely. Exploration for and development of new supplies will be retarded substantially, with a long lag likely between the time significant demand for new gas reappears and the complete restart of exploration and development efforts. In addition, during this period, demand for gas is likely to fall well below the level of some pipelines' take-or-pay obligations.

*Id.* at 97.

**5.** *See Plaintiff's Exhibit A* at ¶¶ 1(a), 3(a), 3(b), and 3(c).

**6.** Apparently, most of the subject contracts are multivintage contracts, *i.e.,* contracts that cover gas from several NGPA categories. Some of the gas is so-called "old gas," which remains subject to FERC's jurisdiction under the Natural Gas Act (NGA), 15 U.S.C. §§ 717 *et seq.* Old gas includes: NGPA § 104 gas, 15 U.S.C. § 3314, which is gas dedicated to interstate commerce prior to enactment of the NGPA; NGPA § 105 gas, 15 U.S.C. § 3315, which is gas sold under pre-existing intrastate contracts; NGPA § 106 gas, 15 U.S.C. § 3316, which is gas sold under rollover contracts; NGPA § 108 gas, 15 U.S.C. § 3318, which is stripper well gas; and, NGPA § 109 gas, 15 U.S.C. § 3319, which is gas not covered by other NGPA categories. Some of the gas is so-called "new gas," which is not subject to FERC's NGA regulatory control, but which remains subject to NGA price ceilings. New gas includes: NGPA § 102 gas, 15 U.S.C. § 3312, which is gas that was not dedicated to interstate commerce prior to enactment of the NGPA; and, NGPA § 103 gas, 15 U.S.C. § 3313, which is gas from new onshore production wells. Finally, some of the gas is so-called "high-cost gas," which is subject neither to FERC's NGA regulatory control nor to an NGPA price ceiling. High-cost gas includes NGPA § 107(c) gas, 15 U.S.C. § 3317, which is gas from new wells producing from a depth greater than 15,000 feet, gas from geopressured brine, occluded gas from coal seams, and gas from Devonian shale formations.

**7.** *See Plaintiff's Exhibit A* at ¶ 2(b). At the time this motion was filed, this would have reduced the price of gas sold to Tenneco by Gulf under the Moncrief Contract by almost $3.00 per MMBtu, an almost one-third reduction in price.

sion for Tenneco to choose to purchase gas on the basis of NGPA categories. Tenneco contends that Gulf has used its category nomination right to increase the proportional volumes of higher-priced categories of gas and to reduce the proportional volumes of lower-priced categories of gas that Gulf delivers to Tenneco under the contracts at issue. Obviously then, Tenneco intends to exercise this category nomination right by specifying that it will purchase more gas from lower-priced categories and less gas from higher priced categories. Thus, by nominating for purchase larger volumes of gas from lower-priced NGPA categories and by reducing the price it will pay for the gas it buys that does fall within the higher-priced NGPA categories, Tenneco hopes to alleviate some of its burden under these multivintage contracts.

Gulf's[8] response to Tenneco's actions under the EGPP was the filing of this breach of contract suit. As remedies for this alleged breach of contract, Gulf seeks specific performance and damages.

Tenneco asserts, in addition to its state-law based contractual defenses, that litigation of this matter necessarily will require resolution of several issues that are within FERC's primary or exclusive jurisdiction. Tenneco explicitly contends that the following three issues should be referred to FERC for initial resolution under the primary jurisdiction doctrine:

(1) Are Gulf Oil Corporation's claims herein contrary to its rights and obligations under the NGA and NGPA?

(2) Is Tenneco's EGPP required for it to carry out its obligations under the NGA and NGPA?

(3) What impact would the relief which Gulf Oil Corporation seeks have on Tenneco and the public interest?

*Memorandum In Support Of Motion To Dismiss For Failure To State Claim, Or Alternatively For Lack of Subject Matter Jurisdiction, Or Alternatively For Referral And Stay, And To Dismiss For Failure to Join Parties Under Rule 19* at 24.

The Court agrees with Tenneco's assertion that this action should be stayed pending the referral of certain issues arising herein that fall within the FERC's primary or exclusive jurisdiction. However, the Court does not agree with Tenneco as to the precise issues to be referred to the FERC. The three above-quoted issues, which Tenneco contends should be referred to the FERC, are entirely overbroad and, therefore, inappropriate for reference to the FERC. However, Tenneco's three proposed issues suggest the following five more specific issues, expressed in the form of interrogatories, which the discussion below indicates are clearly appropriate for reference to the FERC:

(1) What are the causes of the severe imbalance between the gas supplies deliverable to Tenneco under its gas purchase contracts with various producer-suppliers and the ability of Tenneco's markets to absorb such gas at current price levels?

(2) Should Tenneco's prepayments to Gulf for gas not taken by Tenneco, pursuant to contractual take-or-pay provisions, be considered in determining if Gulf's contract prices exceed applicable NGPA price ceilings? If so, did any of Gulf's contract prices exceed applicable NGPA price ceilings?

(3) What is the nature and extent of Gulf's performance obligation under certificates of public convenience and necessity, issued by the FERC pursuant to the NGA, obligating Gulf to provide service to Tenneco?

(4) Did Gulf reduce its deliveries of NGPA § 104 gas, 15 U.S.C. § 3314, to Tenneco? If so, did such reduction constitute a de facto unauthorized abandonment of

---

**8.** In addition to Gulf, almost a score of other natural gas producers have commenced breach of contract actions against Tenneco in various state and federal fora. *E.g., Exxon Corp. v. Tenneco, Inc.*, No. 83–1640–D, W.D.La.; *Forest Oil Corp. v. Tenneco, Inc.*, No. J–84–0084, S.D. Miss.; *Shell Oil Co. v. Tenneco, Inc.*, No. 83– 5480–G, 15th Judicial District Court, Lafayette Parish, Louisiana; *Sanchez-O'Brien Oil & Gas Corp. v. Tenneco, Inc.*, No. 34,579, 49th Judicial District Court, Webb County, Texas; *System Fuels, Inc. v. Tenneco, Inc.*, No. 19,494, Chancery Court of Marion County, Mississippi.

service, which is prohibited by NGA § 7(b), 15 U.S.C. § 717f(b)?

(5) Which party, Gulf or Tenneco, has the power to nominate by NGPA category the proportional volumes of gas that will be bought or sold pursuant to the contracts at issue herein?

## II. *Discussion*

While the underlying dispute here is contractual, this is not simply a garden variety breach of contract case. The natural gas industry is a highly regulated one, and contractual disputes arising therein must be viewed within the context of the industry's complex regulatory framework. Essentially, in the present context, this simply means that the Court must first determine the scope of the FERC's primary jurisdiction and then determine what, if any, issues legitimately arising during the course of this dispute fall within those jurisdictional bounds.[9]

### A. *FERC's Primary Jurisdiction*

■ The scope of a regulatory agency's primary jurisdiction is closely related to, though not coterminus with, the scope of its exclusive jurisdiction. The scope of an agency's exclusive jurisdiction is a purely legal determination based solely on statutory interpretation. The scope of an agency's primary jurisdiction is a more pragmatic determination based on the relative efficiency and expertise of courts vis-a-vis regulatory agencies. A dispute that falls within an agency's exclusive jurisdiction can, as the term indicates, only be resolved by the agency. On the other hand, an issue that falls within an agency's primary jurisdiction can be resolved by either a court or the agency. However, an issue that is within an agency's primary jurisdiction is usually so closely related to the agency's regulatory functions that the

agency enjoys a decided advantage over a court in terms of fact assembly and analysis. For that reason, courts often defer to the expertise of a regulatory agency and refer such issues to the agency for initial resolution. In fact, courts have frequently held that an agency has the primary jurisdiciton to determine the scope of its exclusive jurisdiction when the agency's fact-finding ability and expertise in the area give it an advantage over the courts in making such a determination. *See, e.g., FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972); *J.M. Huber Corp. v. Denman,* 367 F.2d 104, 111–12 (5th Cir. 1966). Thus, the primary jurisdiction doctrine applies whenever resolution of a *dispute,* which is originally cognizable in the courts, requires initial resolution of *issues* that have been placed by a regulatory scheme within the special competence of an administrative body. *United States v. Western Pacific RR Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956).

To determine the scope of the FERC's primary jurisdiction relevant to the present controversy, it is essential for the Court to review the relevant precedents. In light of the close relationship between any agency's primary and exclusive jurisdictions, the relevant precedents include both those cases directly concerning the boundaries of the FERC's primary jurisdiction relevant to contract disputes between producers and pipelines and those cases concerning the relevant boundaries of the FERC's exclusive jurisdiction as well.

The Court will begin its review of the relevant precedents with the Fifth Circuit's comprehensive discussion of the Commission's [10] primary jurisdiction in *Mississippi Power & Light Co. v. United Gas Pipe*

---

9. For an insightful discussion concerning the FERC's primary and exclusive jurisdictional boundaries relevant to the present controversy, concerning the issues arising in this controversy that fall within those jurisdictional boundaries, and concerning the impact of invocation of the primary jurisdiction doctrine in this controversy, see Pierce, *Issues In Gas Contract Litigation,*

35th Oil & Gas Inst. 61, 66–81 (Matthew Bender 1984).

10. "Commission" refers to both the Federal Power Commission (FPC) and the FERC, which replaced the FPC in 1977. *See* Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977).

*Line Co.*, 532 F.2d 412 (5th Cir.1976). In that case, MP & L, a utility company using natural gas as a fuel to generate electricity, filed a breach of contract action against United, a natural gas pipeline company, and its former parent, Pennzoil Co., for curtailment of gas service, which was alleged to be inconsistent with the volumetric obligations of United's contract with MP & L. United and Pennzoil asserted the primary jurisdiction of the Commission. The trial court agreed, stayed all proceedings, and referred the entire dispute to the Commission. The Fifth Circuit agreed with the substance of the lower court's ruling, disagreeing only with the wholesale referral of the entire dispute to the Commission. While agreeing that the Commission's primary jurisdiction should be invoked and that the trial court proceedings should be stayed pending resolution of the referred issues, the *Mississippi Power & Light* Court recognized that the ultimate contractual issues remained for judicial resolution in light of the Commission's resolution of the referred issues. Thus, the case was remanded with directions for the lower court to enter an order specifying those issues that were referred to the Commission.

The *Mississippi Power & Light* Court described the primary jurisdiction doctrine as a means of reconciling the regulatory function of administrative agencies with the judicial function of courts. This reconciliation is accomplished by integrating a particular regulatory agency into the judicial decision making process involved in a legal dispute directly affecting an industry regulated by that agency. Under the primary jurisdiction doctrine, the regulatory agency can be integrated into the judicial decision making process by permitting the agency to have "the first word" on those issues within its special competence. *Id.* at 417.

The Fifth Circuit then analyzed the historical evolution of the primary jurisdiction doctrine. The Court noted that, as initially formulated, the primary jurisdiction doctrine was invoked only if the regulatory agency's decision on the referenced matter would conclusively resolve the underlying dispute. *See, Public Utilities Commission v. United States,* 355 U.S. 534, 539, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958); *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 254, 71 S.Ct. 692, 696, 95 L.Ed.2d 912 (1951); *Texas and P.R. Co. v. Abilene Cottonseed Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). The Court went on to emphasize, however, that the primary jurisdiction doctrine now permits the referral of issues to an agency for initial resolution if prior agency resolution would be of *"material aid"*[11] to the court.[12]

Although no fixed formula exists for applying the doctrine of primary jurisdiction,[13] numerous factors caused the *Mississippi Power & Light* Court to find the following five issues appropriate for reference to the Commission: first, a determination of the causes of United's severe gas shortage; second, an interpretation of United's tariff; third, an interpretation of the United—MP & L contract; fourth, a deter-

---

**11.** *Id.* at 418 (*quoting Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973) (emphasis in original) ).

**12.** The Fifth Circuit pointed out that a court's discretion to invoke the primary jurisdiction doctrine, in those cases where an agency's input would be a material aid to resolution of the ultimate dispute, is not unlimited. "The courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate." 532 F.2d at 419. The Court then set forth six

"general situations in which referral is often unwarranted." *Id.* Finally, the Fifth Circuit stated that courts must always balance the benefits of referral (*i.e.,* the aid of agency expertise) with the costs of referral (*i.e.,* delayed resolution of conflicts).

**13.** "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves it will be aided by its application in the particular litigation." *Id.* (*quoting United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

mination of the impact of administrative compensation on contract damages; and, finally, a determination of the impact of contract damages on the Commission's allocation decision. *Id.* at 420. The factors causing the Court to find the above issues appropriate for reference to the Commission were: (1) the Commission had pervasive regulatory authority over the related curtailment question; (2) the Commission was already involved in resolving many of the issues directly impacting on curtailment-related litigation; (3) the issues were within the Commission's expertise; (4) judicial resolution of the pending damages actions could disrupt the Commission's resolution of the curtailment problem; and, (5) curtailment damages actions were vastly dissimilar from most federal diversity contract actions, were extremely complicated, and would affect the entire nation's energy policy.[14]

The list of factors enumerated above, which the *Mississippi Power & Light* Court employed in resolving the primary jurisdiction issue, demonstrates the close connexity between the FERC's primary and exclusive jurisdictions.[15] Given this close connexity between the FERC's primary and exclusive jurisdictions, it is useful to turn now to an analysis of the FERC's exclusive jurisdiction.[16]

Under the NGA, prior to passage of the NGPA in 1978, one of the most important jurisdictional boundaries relevant to gas contract litigation was that between the FERC's pervasive jurisdiction over the sales of gas for resale in interstate commerce and over the transportation of gas in interstate commerce, on one side, and the statutory "production or gathering" exemption to the FERC's jurisdiction, on the other side.[17] Significantly, the production or gathering exemption has been narrowly construed by the Supreme Court in three important decisions. First, in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), producer sales to interstate pipelines at the wellhead were held to be outside the scope of the production or gathering exemption and, therefore, within the Commission's exclusive regulatory jurisdiction. Second, in *Northern Natural Gas Co. v. Corporation Commission of Kansas*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), the Court held that, while the physical production of gas was within state regulatory authority under the production or gathering exemption, volumetric regulation of interstate pipeline gas purchases was within the Commission's exclusive jurisdiction over gas sales for resale and gas transportation.[18] Third, in *United Gas Pipe Line Co. v. FPC*, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d

---

**14.** Numerous other courts, in a variety of contexts, have employed similar multi-factor assessments of the Commission's primary jurisdiction. *See, e.g., FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 647–48, 92 S.Ct. 1827, 1841–42, 32 L.Ed.2d 369; *Distrigas of Massachusetts Corp. v. Boston Gas Co.,* 693 F.2d 1113, 1118–19 (1st Cir.1982); *CF Industries, Inc. v. Transcontinental Gas Pipe Line Corp.,* 614 F.2d 33, 35 (4th Cir. 1980); *Commonwealth of Virginia v. Tenneco, Inc.,* 538 F.2d 1026, 1032 (4th Cir.1976).

**15.** *See* Pierce, *supra* n. 9 at 70–71.

**16.** As Dean Pierce points out, in analyzing the FERC's exclusive jurisdiction, it is important to recognize that the Commission's primary jurisdiction is broader than its exclusive jurisdiction. *Id.* at 72. This is so, because there are certain issues beyond the bounds of the FERC's exclusive jurisdiction yet so closely related to matters within its exclusive jurisdiction, that courts will find such issues to be within the bounds of the FERC's primary jurisdiction. *Id.*

**17.** The jurisdictional boundaries of the Commission under the NGA are set forth at 15 U.S.C. § 717(b), which in full provides:

The provisions of [the NGA] shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**18.** The states were prohibited from regulating the volume of gas purchased by interstate pipelines, because that would affect the price paid for gas and the Commission had exclusive jurisdiction over gas pricing determinations. 372 U.S. at 90–93, 83 S.Ct. at 649–52.

181 (1966), the Court held that certificated interstate pipeline purchases at the wellhead were outside the bounds of the production or gathering exemption, because such transactions constituted both sales for resale and transportation in interstate commerce subject to the Commission's exclusive jurisdiction. Therefore, the pipeline's cessation of such purchases was an unauthorized abandonment of service in violation of Section 7(b) of the NGA, 15 U.S.C. § 717f(b), which the Commission had authority to rectify.

Under the NGA, another important boundary was that between, on one side, the FERC's pervasive jurisdiction over sales of gas for resale and transportation of gas in interstate commerce and, on the other side, the sales for direct consumption exemption to the FERC's jurisdiction. The sales for direct consumption exemption was narrowed considerably by the Supreme Court's expansive view of the Commission's exclusive transportation jurisdiction in *FPC v. Louisiana Power & Light*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). The *Louisiana Power & Light* Court upheld the Commission's authorization of an interstate pipeline's curtailment, due to the then existing gas shortage, of service to LP & L. The Court held, in rejecting LP & L's arguments that the Commission was without jurisdiction to authorize such curtailment of sales for direct consumption, that the statutory exemption of sales for direct consumption did not prevent the Commission from ordering such curtailment, because the volume of gas provided in a sale of direct consumption fell within the Commission's exclusive jurisdiction over all transportation of gas in interstate commerce. *Id.* at 636–41, 92 S.Ct. at 1836–39. The Court also held, in rejecting LP & L's argument that the Commission could not authorize curtailments inconsistent with contractual provisions, that, since the Commission had exclusive transportation jurisdiction over curtailments to direct consumers, the Commission also had the "paramount power" to order that such curtailments occur in a manner that was inconsistent with contractual provisions. *Id.* at 642–47, 92 S.Ct. at 1839–42. These hold-

ings were based primarily on the Court's perception of the necessity of investing in the Commission sufficient power to implement a uniform national solution to the severe national problems presented by the gas shortage.

The *Louisiana Power & Light* decision is significant in two respects. First, the specific holding indicates the extreme breadth of the Commission's transportation jurisdiction, which under this ruling may encompass any volumetric gas dispute. Second, the general approach reflected in the opinion indicates the Court's willingness to interpret the NGA broadly to give the Commission pervasive jurisdiction and regulatory authority when the Court perceives such broad grant of authority to be necessary for the implementation of nationwide solutions to pressing nation-wide problems. Thus, if the present situation involving gas surpluses and prices above market clearing levels is perceived to be a national problem comparable to the gas shortages of the preceding decade, *Louisiana Power & Light* militates in favor of a similarly broad interpretation of the FERC's jurisdiction and authority to address the present problem.

In addition to the Supreme Court decision discussed above, two circuit court decisions, *Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3rd Cir.1977) and *FERC v. Shell Oil Co.*, 566 F.2d 536 (5th Cir.1978), *aff'd*, 440 U.S. 192, 99 S.Ct. 1273, 59 L.Ed.2d 247 (1979), shed light on the limits of the Commission's jurisdiction relevant to contract disputes between pipelines and producer-suppliers. These two decisions are discussed below.

In *Gulf Oil*, the Third Circuit held that the Commission had exclusive jurisdiction to interpret its own certificate of public convenience and necessity, even though the scope of the certificate was largely defined by the terms of a gas purchase contract that was incorporated in the certificate by reference. Given the inextricably intertwined connexity between the certificate and the contract, the Court concluded that the Commission's exclusive jurisdiction to interpret the certificate necessarily includ-

ed the exclusive jurisdiction to interpret the contract as well. The Court affirmed the Commission's interpretation of the contract and certificate, though that interpretation precluded the potential availability of certain contract law defenses.

In *Shell Oil,* the Fifth Circuit held that the FERC does not have the authority to order producers of certificated gas to act prudently in developing and maintaining deliverability from certificated natural gas reserves, because such order attempted to regulate the physical production of gas, which was within the statutory production and gathering exemption. The Court was careful, however, to distinguish explicitly the FERC's previously established exclusive jurisdiction to regulate the "abandonment of service"[19] and to enforce "service obligations"[20] contained in certificates.

Superficially, *Shell Oil* appears to provide valuable precedential support for Gulf's position opposing invocation of the primary jurisdiction doctrine in the present case, because it is one of the few cases infusing vitality into the production or gathering exemption and it relates closely to the issue of Gulf's alleged reduction of deliveries of NGPA § 104 gas, which forms the basis for the fourth issue referred to the FERC by this Court. However, on closer scrutiny, it is evident that *Shell Oil's* precedential value to Gulf is minimal. First, the decision was affirmed, but by an equally divided Supreme Court, which indicates the utter lack of consensus on the issue presented in *Shell Oil.* Second, the Fifth Circuit recognized, and carefully distinguished, the FERC's exclusive jurisdiction to enforce certificated service obligations and to regulate service abandonment. Finally, and most importantly, *Shell Oil* involved an issue concerning the FERC's exclusive jurisdiction rather than its primary jurisdiction; the FERC had already exercised primary jurisdiction. Thus, *Shell Oil* may well prove significant in resolving the exclusive jurisdiction question of determining whether the issue of Gulf's alleged reduction of deliveries of NGPA § 104 gas falls within the FERC's exclusive jurisdiction to enforce certificated service obligations and to regulate abandonment of services. However, irrespective of the ultimate resolution of that difficult exclusive jurisdiction question, the Court is convinced that the FERC has the primary jurisdiction to determine initially if the issue of alleged reductions of NGPA § 104 gas falls within the scope of its exclusive jurisdiction, because that agency's fact-finding ability and unique expertise concerning the natural gas industry give it a decided advantage over the Court in making such a determination.

In 1978, subsequent to all of the decisions discussed above, Congress enacted the NGPA, which restricts the scope of the FERC's exclusive jurisdiction and, therefore, necessarily impacts on the Court's analysis of the primary jurisdiction issue. Prior to enactment of the NGPA, under the NGA, the FERC had exclusive jurisdiction over sales for resale and transportation in interstate commerce, to interpret and enforce its certificates, and to regulate abandonment of service. Moreover, the courts had almost uniformly interpreted the FERC's sales for resale and transportation jurisdictions broadly and the production and gathering and the direct sales exemptions narrowly. In short, the FERC's exclusive jurisdiction under the NGA was so broad that it is almost beyond cavil that the five enumerated issues in this matter would have fallen within the FERC's primary jurisdiction, because, even if it were ultimately determined that the issues fell outside the FERC's exclusive jurisdiction, they were so closely related to matters within the FERC's exclusive jurisdiction that reference to the FERC for initial resolution would undoubtedly have been mandated. After enactment of the NGPA, the FERC no longer has NGA jurisdiction over

**19.** *Shell Oil,* 566 F.2d at 539 (citing *Sunray Mid-Continental Oil Co. v. FPC,* 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960) and *Sun Oil Co. v. FPC,* 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639 (1960).

**20.** *Id.* (citing *Mitchell Energy Corp. v. FPC,* 533 F.2d 258 (5th Cir.1976) and *Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co.,* 177 F.2d 942 (6th Cir.1949) ).

producer sales of NGPA §§ 102, 103, or 107 gas, 15 U.S.C. § 3431(a)(1), which eliminates the FERC's certificate and abandonment power over such gas. This statutory change also eliminates the FERC's jurisdiction to interpret the pricing provisions of contracts for the sale of such gas. *Pennzoil Co. v. FERC*, 645 F.2d 360, 380–82 (5th Cir.1981). Significantly, however, under the NGPA the FERC retains jurisdiction to interpret the pricing provisions of contracts for sale of gas that remains subject to NGA jurisdiction. *Id.* The FERC also retains exclusive jurisdiction to enforce price ceilings on all categories of gas except NGPA § 107 gas. Finally, the FERC still retains exclusive jurisdiction over the transportation of gas in interstate commerce. 15 U.S.C. § 3431(a)(2). Thus, despite the NGPA's significant narrowing of the scope of the FERC's exclusive jurisdiction, the Court is convinced, as the discussion in the next section below indicates, that the FERC still retains primary jurisdiction over the enumerated issues raised in this dispute.

B. *Five Issues Within The FERC's Primary Jurisdiction*

 A careful analysis of each of the five issues indicates that all are within the FERC's post-NGPA primary jurisdiction. The first issue concerns a determination of the facts and circumstances that resulted in the severe imbalance between gas supplies deliverable to Tenneco under its various contracts and the ability of Tenneco to market such gas at current supramarket price levels. Development of the factual context by the agency that is expert in this area, *i.e.*, the FERC, is a well established basis for invocation of the primary jurisdiction doctrine. *Mississippi Power & Light Co.*, 532 F.2d at 420 (citing *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952) ). Passage of the NGPA has no impact on the FERC's primary jurisdiction over this issue.[21] The

second issue is whether Tenneco's prepayments for gas not taken must be considered in determining if Gulf's contract prices exceeded applicable NGPA price ceilings. The FERC clearly has primary jurisdiction over this issue, even after the NGPA, since it directly concerns the FERC's exclusive jurisdiction to apply NGPA price ceilings, which remain on all categories of gas except NGPA § 107 gas, and since apparently all of the contracts at issue herein are multivintage contracts, which obviously involve gas from categories other than just NGPA § 107 gas. The third issue concerns the interpretation of the FERC's certificates obligating Gulf to provide service to Tenneco. Under the NGPA, the FERC retains exclusive jurisdiction to interpret its own certificates, but the certificate requirements of the NGA now apply only to certain categories of gas. The multivintage contracts at issue herein cover both gas to which the certificate requirements of the NGA no longer apply, *i.e.*, NGPA §§ 102, 103, and 107 gas, and gas to which the certificate requirements of the NGA still apply, *i.e.*, NGPA §§ 104, 106(a), and 108 gas. Thus, since the FERC's jurisdiction to interpret certificates covers a portion of the gas involved in this dispute, and since no practical means exists for independently resolving the remainder of the dispute, the Court concludes that referral of the certificate interpretation issue is appropriate under the primary jurisdiction doctrine as interpreted in *United Gas Pipe Line* and *Gulf Oil.* The fourth issue is whether Gulf's alleged reduction in deliveries of NGPA § 104 gas constitutes an unauthorized abandonment of service. Although the multivintage contracts at issue here involve more than just NGPA § 104 gas, the FERC has primary jurisdiction over this issue, since NGPA § 104 gas remains subject to the NGA § 7(b) prohibition against unauthorized abandonment of

---

**21.** While this issue alone would not justify invocation of the primary jurisdiction doctrine, it is referable as an adjunct to the remaining issues. A detailed development of the facts and circumstances of the present market problems facing the natural gas industry may ultimately prove essential for determining if the industry's current problems constitute a crisis of similar proportions to the gas shortages of the 1970's.

service, and since as a practical matter the Court is unable to resolve any other issues in this dispute until the abandonment issue is resolved by the FERC. The final issue is whether Gulf or Tenneco has the power to nominate by NGPA category the proportional volumes of gas bought or sold pursuant to the contracts at issue. This issue is clearly appropriate for referral to the FERC, since that agency has the primary jurisdiction to determine whether interpretation of contract provisions concerning category nomination rights falls within its exclusive transportation jurisdiction, as interpreted in *Northern Natural Gas, United Gas Pipe Line,* and *Louisiana Power & Light,* or instead within the production and gathering exemption, as interpreted in *Shell Oil.*

In addition to the individual reasons supporting referral to the FERC of each of the enumerated issues, the broader perspective also supports invocation of the primary jurisdiction doctrine in this case. First, none of the factors listed in *Mississippi Power & Light* as militating against the application of the primary jurisdiction doctrine are present. Second, the Commission is presently considering, in FERC Docket No. RP83–109 and others, most of the issues raised herein. Finally, the present problems facing the natural gas industry appear to require a comprehensive national solution imposed by an agency with the necessary expertise and with the necessary power to implement such a solution successfully.