876 F.2d 46
 EP OPERATING COMPANY, Hi Production Company, Inc., Opubco
Resources, Inc., Penrod Energy Company, Hunt Petroleum
Corporation, Petro-Hunt Corporation, Prosper Energy
Corporation, and Placid Oil Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 No. 88-4525.
 United States Court of Appeals,
Fifth Circuit.
 June 27, 1989.
 
 William F. Demarest, Jr., Holland & Hart, Washington, D.C., for EP Operating Co.
 M. Douglas Adkins, Gardere & Wynne, Dallas, Tex., for HI Production Co., Inc.
 James L. Armour, Locke, Purnell, Rain & Harrell, Dallas, Tex., for Opubco Resources, Inc.
 Andrew McCulloch, Dallas, Tex., for Hunt Petroleum Co.
 Frank P. Saponaro, Jr., Morgan, Lewis & Bockius, Washington, D.C., for Penrod Energy Co., Petro-Hunt Corp., Prosper Energy Corp., and Placid Oil Co.
 Robert Wolfe, Jerome Feit, Sol. FERC, Joanne Levegue, Washington, D.C., for F.E.R.C.
 Petition for Review of Orders of the Federal Energy Regulatory Commission.
 Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.
 CLARK, Chief Judge:
 
 
 1
 In December, 1987, Placid Oil Company, on behalf of itself and other operators, petitioned the Federal Energy Regulatory Commission for a declaratory order that no certificate of public convenience and necessity was required for the construction and operation of a proposed natural gas pipeline known as the Green Canyon Line. EP Operating Company subsequently intervened in the proceeding. According to the operators, this line would be a gathering facility exempted from Commission jurisdiction by section 1(b) of the Natural Gas Act. The Commission determined, however, that the line would be a transportation facility subject to the Commission's jurisdiction under section 7(c) of the NGA. Because the record establishes that the primary function of the Green Canyon Line is production and gathering, we reverse the Commission's decision. The line is exempt from Commission regulation, and no certificate of public convenience and necessity need be obtained for its operation.
 
 Facts
 
 2
 EP Operating Company and the other joint petitioners hold a number of leases in the Green Canyon and Ewing Bank areas of the federal Outer Continental Shelf (OCS). These areas are located approximately 80 miles offshore from Louisiana, at depths of 1,500 feet or more. Placid Oil's Penrod 72 floating rig is located at Green Canyon Block 29, in 1,640 feet of water. The floating rig is equipped with both drilling facilities and limited separation and dehydration facilities. It is anticipated that ultimately natural gas production from up to 24 subsea template and satellite wells will feed into the separation and dehydration facilities at the floating rig.
 
 
 3
 Only the most rudimentary separation and dehydration operations, sufficient to allow the gas to be transported through a pipeline, are conducted at the site of the floating rig. The production is separated into a primarily gaseous-phase stream (which includes natural gas, water vapor, and liquefiable hydrocarbons) and a primarily liquid-phase stream (consisting of crude oil, saltwater, and suspended or dissolved gaseous hydrocarbons). The primarily gaseous-phase stream is partially dehydrated solely for the purpose of preventing the formation of water-hydrocarbon hydrates that would hinder the flow of the stream through a pipeline.
 
 
 4
 The gaseous-phase stream is then transported through a 16-inch line (the Green Canyon Line) to a fixed production platform at Ship Shoal Block 207, located in shallow water (105 feet) 51 miles closer to shore. A parallel 14-inch line was also constructed which, it was contemplated, would carry the liquid-phase stream of salt water and crude oil. However, the 16-inch line is currently being operated as a dualphase line carrying the full well stream of liquefiable hydrocarbons, natural gas, water vapor, condensate, crude oil, and salt water. The Green Canyon Line has a maximum operating pressure of 2,160 pounds per square inch, which is the wellhead pressure. No compression is performed on the floating rig. Maximum capacity is 200 million cubic feet per day (MMCFD). Gas production from the Green Canyon Block is projected to peak at 140 MMCFD, so the line has a planned excess capacity that may be used to transport other gas. Placid constructed approximately 43 miles of the line without Commission authorization. On April 6, 1989, the Commission issue a permanet certificate authorizing Placid to construct the final eight miles and to operate the Green Canyon Line. No sanctions were invoked against Placid.
 
 
 5
 The fixed platform at Block 207 bears full production processing equipment, and it is there that the additional processing necessary to achieve pipeline quality standards occurs. The gas is then delivered into the ANR pipeline, which transports it to an onshore delivery point. Only the 51-mile, 16-inch pipeline connecting the floating rig to the fixed platform is at issue in this case. EP maintains that although the diameter and length of the line are greater than typical gathering lines, its primary function is an integral part of the production and gathering process.
 
 I.
 
 6
 Section 1(b) of the Natural Gas Act specifically exempts the production and gathering of natural gas from Commission jurisdiction. In determining whether this statutory exemption applies, the Commission must make a factual determination whether a company's primary function consists of the interstate transportation of gas or some other activity. Ben Bolt Gathering Co., 26 F.P.C. 825, 827 (1961), aff'd, 323 F.2d 610 (5th Cir.1963). This "primary function test" involves a case-by-case consideration of all the facts and circumstances of the particular case rather than the application of any overarching bright line standards. However, certain relevant considerations have been identified, including:
 
 
 7
 1) the diameter and length of the facility;
 
 
 8
 2) the location of compressors and processing plants;
 
 
 9
 3) extension of the facility beyond the central point in the field;
 
 
 10
 4) location of wells along all or part of the facility; and
 
 
 11
 5) the geographical configuration of the system.
 
 
 12
 Farmland Industries, Inc., 23 F.E.R.C. p 61,063, 61,143 (1983). The Commission also asserts a sixth factor: the operating pressure of the line. In its declaratory order, the Commission found that the Green Canyon Line satisfied five of the six interstate transportation criteria.
 
 II.
 
 13
 An agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). Although this standard of review is highly deferential, a precondition to judicial deference is that the agency's interpretation be consistent with those rendered by the agency in other cases. The agency must provide a reasoned explanation for its departure from established precedent. The primary function test has been applied in a number of contexts, but two are particularly analogous to the present controversy. In Shell Gas Pipeline Co., 36 F.E.R.C. p 61,317 (1986) (Shell I ) and Shell Gas Pipeline Co., 41 F.E.R.C. p 61,032 (1987) (Shell II ), the Commission held that a 16-mile, 14-inch OCS line and a 27-mile, 16-inch OCS line, respectively, were exempt under section 1(b).
 
 
 14
 The primary distinctions articulated by the Commission between the Shell lines and the Green Canyon Line were the length and design operating pressure of the lines. The Commission argues that the length, diameter, and operating pressure of the Green Canyon Line are significantly greater than typical gathering lines, indicating that the line is a transportation facility. However, in Shell II the Commission rejected a mechanical application of length and diameter standards to determine whether a facility is within its jurisdiction. The Commission stated that although the length (27 miles) and diameter (16 inches) of Shell's proposed line were larger than offshore lines previously found to be nonjurisdictional, "these differences alone ... are not enough to change the primary function of the [Boxer] line from gathering to transmission." The 27-mile length, the Commission found, was necessary due to the platform location and the lack of an available interconnection with a jurisdictional pipeline. The Commission also stated that the 16-inch diameter was not unreasonable in light of the quantity of gas (148 MMCFD) the line was expected to handle.
 
 
 15
 Although the Green Canyon Line is nearly twice the length of the Shell Line, the record discloses that its length is solely a function of location. Facilities at which the stream can be processed to achieve pipeline quality gas which can be introduced into a jurisdictional line are 51 miles away. The length of the line is no more than the distance between the point of production and the nearest appropriate connection with an interstate pipeline. The Green Canyon Line does cross a Transco pipeline at a point much nearer the floating rig. However, Transco will accept only gas which has been fully dehydrated and meets its pipeline quality standards. The product in the Green Canyon Line cannot be introduced into the Transco line since the stream contains up to 16% salt water.
 
 
 16
 The diameter of the Green Canyon Line is identical to that of Shell's Boxer Line, although the increased pressure makes the potential quantity of gas that can be transported in the Green Canyon Line greater. The gas flows through both lines at reservoir pressure without added compression.
 
 
 17
 In addition to the length and pressure of the line, the Commission attached particular significance to the fact that the floating platform would be the central point in the field. According to the Commission, the central point in any field is that point where all the gas is delivered into a single line. Gathering is complete at this point, so that lines extending downstream from there are generally considered to be transportational lines. EP's floating rig on Block 29 does meet this definition of central point. However, this is only one factor to be considered. The true test of primary function is whether, with reference to the specific facts and circumstances of this particular line, its primary function is gathering. EP is drilling 80 miles from shore, on the Outer Continental Shelf in 1640 feet of water. EP asserts that no jurisdictional pipeline is willing to build a line out that distance and depth to receive EP's product. Even if a transportation facility was available to service Green Canyon Block 29, the gas is not pipeline quality. The weight of complete processing equipment necessary to achieve that standard would sink the floating rig. The Green Canyon Line is simply the most practical way to move the product from the seabed to a point nearer shore where it can be processed and introduced into a pipeline. Additionally, the validity of making a central-point-in-the-field analysis in regard to isolated OCS operations is unclear. Deep water rigs are typically unitary structures. This factor was not relied on in the Shell I and Shell II decisions.
 
 
 18
 The Commission further noted that all wells will be upstream of the floating rig rather than along spokes from the hub of the line, and stated that the geographical configuration of the line makes it nothing but an extension of an interstate transportation facility. The presence of wells along an onshore line indicates that the line is in a producing area. In the Shell decisions, however, the Commission found that the offshore lines were in a producing area even though no wells were located along the line. The geographic configuration of the Green Canyon Line is nearly identical to that in the Shell II case, where the Commission stated that the configuration indicated a gathering function. The Commission has offered no reasonable explanation for the disparate treatment of the Green Canyon Line. The primary function of the Green Canyon Line is as an integral part of the natural gas gathering system for the Green Canyon area, and the line is exempt from Commission jurisdiction.III.
 
 
 19
 Although the Green Canyon Line as presently operated is not subject to the Commission's regulation, two additional matters need to be addressed. First, EP argues that the Commission's exercise of jurisdiction over the Green Canyon Line is a form of "backdoor" regulation which will frustrate the supply enhancement objectives of the Natural Gas Policy Act. The NGPA eliminated Commission jurisdiction over "first sales" of gas from new leases on the Outer Continental Shelf. EP apparently is of the view that since the Commission cannot regulate the price of the gas moving in the Green Canyon Line, the transportation of that gas in interstate commerce does not invoke Commission certification authority. This view is without merit. As explained by the Supreme Court in FPC v. Louisiana Power & Light Co., 406 U.S. 621, 626 n. 1, 92 S.Ct. 1827, 1831 n. 1, 32 L.Ed.2d 369 (1972), "a jurisdictional pipeline transports natural gas in interstate commerce and for that reason is subject to FPC certification jurisdiction." Section 601 of the NGPA provides that its purpose is to coordinate transportation jurisdiction under the NGA with other provisions of the NGPA. The statement of Congress accompanying the NGPA explains that the Commission "retains its transportation certificate authority under section 7 of the Natural Gas Act." The movement of gas in interstate commerce is still clearly within the Commission's jurisdiction. Our decision is based on the record which clearly demonstrates that this facility is an integral part of production and gathering and therefore exempted by section 1(b).
 
 
 20
 Second, as noted above, the Green Canyon Line has significant excess capacity. EP has stated that it intends to transport gas for other companies and to charge a fee for the service. It also may separate the streams transported in the 16-inch and 14-inch lines. Today's decision does not predict what effect such changes in use might have on the primary function of the facility.
 
 IV.
 
 21
 The Commission has not provided a reasonable explanation for the difference in treatment of the Boxer and Green Canyon Lines. Given the marked similarities in operational characteristics, they should have received similar classification. The finding by the Commission that the Green Canyon Line is a jurisdictional transportation facility is
 
 
 22
 REVERSED.