**NORTHWEST PIPELINE CORPORATION,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Questar Pipeline Company; Colorado Interstate Gas Company; Washington Natural Gas Company; Cascade Natural Gas Corporation; Southwest Gas Corporation; ANR Pipeline Company; Pacific Gas and Electric Company; and Natural Gas Corporation of California, Intervenors.

No. 88–2261.

United States Court of Appeals, Tenth Circuit.

June 13, 1990.

Steven W. Snarr, Asst. General Counsel, (Mark C. Moench, Sr. Atty., on the briefs) Salt Lake City, Utah, for petitioner Northwest Pipeline Corp.

Robert Wolfe, Atty., (Catherine C. Cook, General Counsel and Jerome Feit, Sol., on

the brief) Washington, D.C., for respondent F.E.R.C.

Gary G. Sacket, Div. Counsel, Salt Lake City, Utah, for Intervenor Questar Pipeline Co.

Robert B. McLennan, Atty., San Francisco, Cal., for Intervenors Pacific Gas and Electric Co. and Natural Gas Corp. of California.

Daniel F. Collins, Donald C. Shepler, and Kathrine L. Henry, Washington, D.C., on the brief, for Intervenors ANR Pipeline Co. and Colorado Interstate Gas Co.

Before McKAY, MOORE, and ANDERSON, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Northwest Pipeline Corporation (Northwest) petitions for review of two orders of the Federal Energy Regulatory Commission (FERC or the Commission) asserting jurisdiction over certain facilities under § 1(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717(b). Northwest urges the production and gathering exclusion of § 717(b) exempts these facilities. Finding error in the Commission's assertion of jurisdiction, we reverse the orders in this respect.

## I. Background

Northwest operates an interstate gas pipeline system which extends from New Mexico to Washington in the western United States. In addition to transporting and selling gas, Northwest produces, purchases, and imports gas, almost all of which is sold for resale subject to the Commission's jurisdiction.

Northwest also owns and operates several gathering systems[1] in New Mexico, Colorado, Utah, and Wyoming, which are utilized for its own system supply and for other parties. The focus of the underlying rate proceeding in this case is the Piceance Basin area, comprised of six gathering facilities located in Colorado and Utah. Of the six Piceance Basin facilities, three, Grand Valley, Foundation Creek, and North Douglas Creek, are connected to Northwest's own mainline transmission system; and three, River Bend, Love, and Argyle, are connected to the transmission system of Mountain Fuel Resources, Inc.[2]

Natural Gas Corporation of California (NGC), an exploration subsidiary of Pacific Gas and Electric Company (PG & E), utilizes Northwest's gathering and transportation services in the Piceance Basin area. Northwest moves NGC gas from the wellhead in the Rocky Mountain region through a tentacular network which feeds into Northwest's interstate pipeline for ultimate delivery to PG & E at the California border. Northwest's pipeline provides the "most practical routing for transportation of NGC's gas." Opinion No. 270, 38 F.E. R.C. ¶ 61,302, at 61,979 (1987).

These proceedings were generated by Northwest's filing a general rate increase for the gathering and transportation services charged to NGC in the Piceance Basin area. Ultimately, the parties agreed to proposed settlements approved by the Commission on all issues except the appropriate rate level for gathering services Northwest performs for NGC in the Piceance Basin. Surviving the Commission's resolution of this rate issue[3] is the dispute over the propriety of FERC's assertion of jurisdiction in the first instance over these gathering facilities.

1. The terms, "gathering system" or "gathering facility," refer to "pipelines and other facilities used to collect gas from various wells and bring it by separate and individual lines to a central point where it is delivered into a single line." *In re Barnes Transp. Co.*, 18 F.P.C. 369 (1957). "Gathering lines" are "[p]ipes used to transport oil or gas from the lease to the main pipeline in the area.... In the case of gas, the flow is continuous from the well head to the ultimate consumer, since gas cannot be stored." 8 H. Williams & C. Meyers, *Oil and Gas Law* 406–07 (1987).

2. Questar Pipeline Company assumed the interests of Mountain Fuel Resources, Inc., and, as an intervenor in this action, filed a brief.

3. The ALJ divided the gathering rate issue into four separate inquiries: (1) the Commission's jurisdiction to review Northwest's gathering rates; (2) the choice of rate method; (3) the cost allocation and rate design; and (4) the prudence of Northwest's expenditures for the facilities involved.

The Commission affirmed the initial decision of the ALJ who found the gathering services Northwest performed for NGC subject to FERC's jurisdiction. The Commission agreed with the ALJ that the parties' use of the term "gathering" as a shorthand to describe the services at issue was not alone dispositive of the function performed.[4] Instead, Commission and court precedent cast these services as the transportation of natural gas in interstate commerce. *Id.*, at 61,981. To reach this conclusion, the Commission reasserted its current preference for judging the facilities by using a "primary function" test instead of the more rigid, traditional tests previously applied to distinguish between jurisdictional transportation and nonjurisdictional gathering.[5] By fostering the application of this test, the Commission suggested it could judge the facilities as a whole, not by their individual parts, so that given lines would not be segregated into jurisdictional and nonjurisdictional segments. Moreover, the Commission asserted that even if the Piceance Basin encompassed true gathering lines in terms of configuration, its concomitant primary function of transportation of gas from the wellhead to the interstate pipeline would override, subjecting the facilities to the Commission's jurisdiction. Finally, the Commission affirmed the assertion of jurisdiction on the ground that were it to decline regulating these facilities, an attractive regulatory gap would be created. "The conclusion is irresistible that Congress desired regulation by federal authority rather than nonregulation." *Id.*, at 61,983 (quoting *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 28, 81 S.Ct. 435, 449–50, 5 L.Ed.2d 377 (1961)).[6]

Subsequently, the Commission denied Northwest's request for a rehearing, rejecting Northwest's contentions that the Commission improperly redefined the primary function test and inexplicably departed from prior decisions. Viewing the result of this case against the vast regulatory scheme created by Congress, the Commission concluded that "the results here must be based on the intent of Congress in enacting the Act and that the Commission, nonetheless, has jurisdiction over these rates." Opinion No. 270–A, 43 F.E.R.C. ¶ 61,491, at 62,215 (1988).[7]

Northwest now challenges FERC's orders, arguing the Commission (1) exceeded its statutory authority, essentially rendering the § 1(b) gathering exemption a nullity; (2) departed from precedent in an arbitrary and capricious manner; (3) discriminated against interstate pipelines in its application of the gathering exemption; and (4) failed to support its decision with substantial evidence. We have jurisdiction to review these contentions under section 19(b) of the NGA, 15 U.S.C. § 717r(b).

---

4. Various contracts between Northwest and NGC were entitled Gas Gathering Agreements and referred to the services as gathering.

5. Previously, the Commission had applied two other tests. The "behind-the-plant" test made the determination of whether a particular facility was exempt based on location; i.e., if the facility was located behind a gas processing plant, it was judged to be nonjurisdictional. *See Wisconsin v. FPC*, 205 F.2d 706 (D.C.), *cert. denied*, 346 U.S. 896, 74 S.Ct. 218, 98 L.Ed. 397 (1953). The "central point" test characterized the gathering function as continuing until "the point where gas is collected at one central point before delivery into a single line where transmission begins." *In re Barnes Transp. Co.*, 18 F.P.C. at 372. *See* Opinion No. 270, 38 F.E.R.C. ¶ 61,302, at 61,988.

6. Two Commissioners disagreed with this conclusion, questioning the underlying assumptions on which the decision was based and addressing what they considered to be the order's redefinition of the primary function test. Commissioner Sousa stated:

> This test, as applied as recently as last month, has made the jurisdictional determination based on the primary function of the *facility*. The judge's analysis, while citing to the applicable precedent, redefines the test so as to make the primary function of the *company* determinative. The decision, without discussing any reasons for the change, adopts the new approach to the matter....

38 F.E.R.C. ¶ 61,302, at 61,990 (Commissioner Sousa, dissenting; Commissioner Trabandt, concurring in the dissent). The Commissioners, however, concurred in the rate result of the order.

7. In a second dissent, Commissioner Sousa reiterated his objection to the opinion's departing from the *Farmland* definition, *see infra* p. 1408, of the primary function test without providing any reasoned basis for the action.

## II. Section 1(b) Jurisdiction

### A.

Northwest asserts section 1(b) of the NGA circumscribes the Commission's jurisdiction to regulate the transportation of natural gas in interstate commerce for sale or resale and reserves the regulation of production or gathering to the states. In effect, Northwest contends the Commission's broad sweep of jurisdictional and nonjurisdictional facilities under one rug implicitly repeals the production and gathering exemption contrary to congressional intent and Commission and court precedent.

In opposition, summarizing the background and interplay of the NGA and the National Gas Production Act (NGPA), the Commission responds that its present regulatory effort reflects longstanding precedent that "no aspect of the interstate business of transporting or selling natural gas for resale is to be left unregulated by the Commission." In FERC's view, this case becomes an essential facet to the expanded regulatory role Congress intended in the agency's oversight of national energy production. According to FERC, this evolving regulatory scheme promotes and protects a national, interstate gas market. Moreover, fostering competitive market forces stimulates the national wellhead commodity market and assures equal and open access to that market.[8] The Commission contends that, within this scheme, the production and gathering exemption must be narrowly drawn and confined to the physical acts alone of production and gathering of natural gas which the states may regulate in the interest of natural resource conservation.

### B.

■ Section 1(b) of the NGA, 15 U.S.C. § 717(b), defines FERC's jurisdiction. It states:

(b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

In § 1(b) of the Act,

[t]hree things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

*FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 636, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369 (1972) (quoting *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n*, 332 U.S. 507, 516, 68 S.Ct. 190, 194–95, 92 L.Ed. 128 (1947)). Set apart from federal regulation were the activities of production and gathering. Therefore, "under section 1(b) the Commission does not have express or implied rate-regulatory jurisdiction of the production and gathering of gas." *Colorado Interstate Gas Co. v. FPC*, 142 F.2d 943, 952 (10th Cir.1944), *aff'd*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

However, because the NGA's "utility-type ratemaking," *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd.*, 474 U.S. 409, 420, 106 S.Ct. 709, 715, 88 L.Ed.2d 732 (1986), was ill-suited to regulate or remedy the severe gas shortages of

---

**8.** The Commission's brief includes a discussion of Order No. 436, 18 C.F.R. § 284.8(b), which, it explains, imposes an open access condition on pipelines seeking Section 311 transportation or blanket certificates for transportation. The open access condition requires the pipelines to provide transportation without undue discrimi- nation or preference. Within this scheme, FERC maintains that its right to regulate rates from the wellhead to the access point of a main transmission line is essential to perform its statutory duty of preventing "unjust and unreasonable" charges and anti-competitive abuse.

the early 1970's, Congress enacted the NGPA, which "reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand." *Id.* at 421, 106 S.Ct. at 716 (citing S.Rep. No. 95–436, at 10, U.S.Code Cong. & Admin.News 1978, pp. 7659, 7858). Along with the NGPA's unleashing market forces to a greater extent to determine the supply, demand, and price of natural gas, FERC's regulatory control expanded to include jurisdiction over the intrastate market. *Id.* at 421, 106 S.Ct. at 716.[9]

Nevertheless, the Court has continued to circumscribe FERC's broad authority to regulate comprehensively under the NGA and NGPA. Recently, in *Northwest Central Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989), the Court posited the conclusion that FERC does not preempt the States' "traditional power" to regulate the production of gas on the premise that FERC's regulatory power is "carefully divided up." 489 U.S. at ——, 109 S.Ct. at 1273. The Court emphasized that although Congress could have empowered FERC to regulate the entire natural gas field to *the limit of constitutional power*, it did not do so. *Id.* 109 S.Ct. at 1273–74. Instead, Congress confined FERC's jurisdiction within the limits of section 1(b), specifying not only the intended reach of federal power, but also "the areas into which this power was not to extend." *Id.* at 1274 (quoting *FPC v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 503, 69 S.Ct. 1251, 1255, 93 L.Ed. 1499 (1949)).

FERC, therefore, has exclusive jurisdiction over the sale and transportation of natural gas in interstate commerce for re-

sale, while Congress expressly reserved to the states "the power to regulate, among other things 'the production or gathering of natural gas,' that is, 'the physical acts of drawing gas from the earth and preparing it for the first stages of distribution.' " 109 S.Ct. at 1274 (quoting *Northern Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 89–90, 83 S.Ct. 646, 649–50, 9 L.Ed.2d 601 (1963)).[10] Consistent with Congress' intent, the terms, production and gathering are to be "narrowly confined," *Transcontinental Gas Pipe Line*, 474 U.S. at 418, 106 S.Ct. at 714–15, and "exceptions to the primary grant of jurisdiction in section 1(b) are to be strictly construed." *Interstate Natural Gas Co. v. FPC*, 331 U.S. 682, 690–91, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947).

Thus, although FERC's power to regulate may extend to the limits of its jurisdiction, the "express jurisdictional limitation on FERC's powers contained in § 1(b) of the NGA," *Northwest Central Pipeline*, 109 S.Ct. at 1274, cannot be recast or obscured in the agency's attempt to formulate policy to protect the public interest and burner-tip consumer.[11] Unless Congress removes existing limitations on FERC's jurisdiction, the Agency's perception of national policy cannot establish or alter that jurisdiction which Congress has expressly granted. *See FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 636, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369 (1972).

### C.

We review the Commission's determination that the Piceance Basin facilities are jurisdictional to ascertain whether the deci-

9. However, the Court has specifically noted that the enactment of the NGPA did not alter its consistent interpretation of FERC's jurisdiction. *See Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986).

10. In *Saturn Oil & Gas Co. v. FPC*, 250 F.2d 61, 64 (10th Cir.1957), *cert. denied*, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532 (1958), a case involving the issue whether a small company selling natural gas at the wellhead is subject to the Natural Gas Act, the court stated the production and gathering exemption "applies to the physical ac-

tivities, facilities, and properties used in the production and gathering of natural gas and not to the business of production and gathering." (citing *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 677, 74 S.Ct. 794, 796, 98 L.Ed. 1035 (1954)).

11. Indeed, FERC's appellate brief does little to examine the factual and legal underpinning of this adjudication. Instead, the questions in this case are submerged in the Commission's broad policy discussions about the need for national supervision of energy policy.

sion has an adequate basis in law. *Walker Operating Corp. v. FERC,* 874 F.2d 1320, 1328 (10th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 365, 107 L.Ed.2d 352 (1989) (citing *Alexander v. FERC,* 609 F.2d 543, 546 (D.C.Cir.1979)). "Unlike factual findings, questions of law are freely reviewable by the courts, and courts are under no obligation to defer to the agency's legal conclusions." *Id.* at 1332 (quoting *Pennzoil v. FERC,* 789 F.2d 1128, 1235 (5th Cir.1986)).

The Commission held that because the gathering lines in question are connected to an interstate pipeline, owned by a major interstate pipeline, the lines, even if performing traditional gathering functions, would be deemed jurisdictional. To reach this result, the Commission applied the primary function test. Our review must focus on the reformulation and application of the test to the facts of this case.

### III. Primary Function Test

#### A.

In *Farmland Industries, Inc.,* 23 F.E.R.C. ¶ 61,063 (1983), the Commission announced its preference for applying a primary function test to decide whether a particular facility or pipeline qualifies for the gathering exemption. Indeed, the Commission adopted the test with the recognition that its analysis of the gathering exemption had become "more refined" over the years. *Id.,* at 61,142.

In a prior disposition, the Commission denied Farmland, Inc.'s predecessor the gathering exemption on the ground that the predecessor, Brooks Pipe Line Company, was a " 'natural-gas company' engaged in the transportation of gas in interstate commerce." This designation, the Commission stated, arose from the application of the "producer-pipeline dichotomy," a single mechanical test that was dispositive of the facility's status. *Id.*

Applying the primary function test, however, the Commission reversed its prior order. The Commission explained, "the ultimate test is whether the primary function of the facility can be classified as transportation or gathering." *Id.,* at 61,143. The Commission listed several factors to consider in judging the facility:

1) the diameter and length of the facility,
2) the location of compressors and processing plants,
3) the extension of the facility beyond the central point in the field,
4) the location of wells along all or part of the facility, and
5) the geographical configuration of the system.

Applying these criteria to *Farmland,* the Commission concluded the facility (1) located behind a processing plant; (2) spanning only 18 miles; (3) having a six-inch diameter pipe; and (4) operated at nonpipeline transmission pressures, had, as its primary function, the gathering of natural gas. A companion facility, satisfying both the central point in the field and primary function tests, was also judged to be gathering although it, too, had previously been denied the exemption. *Farmland,* thus, indicated that no single factor would be dispositive in the Commission's consideration of all the facts and circumstances of a given case.[12]

In *Dorchester Gas Producing Co.,* 32 F.E.R.C. ¶ 61,409 (1985), the Commission examined certain facilities located behind a processing plant and concluded the section 1(b) exemption applied. The Commission reiterated:

> [I]t would consider all the facts and circumstances of each case, rather than mechanically applying any one particular standard to determine the nature of any facility. The facility *need not meet all* of the *Farmland* criteria. In any given situation, the criteria can and frequently do overlap. The *Farmland* primary

---

**12.** The Commission reevaluated and then reversed its prior order in *Beacon Gasoline Co.,* 30 F.E.R.C. ¶ 61,041 (1985), and found the facilities operationally similar to those in *Farmland* upon application of the primary function test. In another order, *Locust Ridge Gas Co.,* 37 F.E.R.C. ¶ 61,295 (1986), the Commission reversed its denial of the gathering exemption although the facilities were previously found to serve the sole purpose of bringing gas to a point of interconnection with two interstate pipelines. *Id.,* at 61,882.

function test has not overruled, but merely subsumes, other traditional tests used to determine the nature of the facility.[13]

*Id.*, at 61,917 (emphasis added).

In *West Texas Gathering Co.*, 45 F.E.R.C. ¶ 61,386 (1988), the Commission stated that "an analysis under the 'primary function' test must assess and weigh all of the specific facts and circumstances present in a given system, and on the basis of that assessment, determine whether the primary function of a pipeline system is the gathering or the transmission of natural gas." *Id.*, at 62,221. The Commission denied rehearing of its prior order finding jurisdiction over the facility. However, in a separate dissent to the prior order, a Commissioner noted that certain factors were too heavily weighed. Indeed, the dissent predicated its analysis on the recognition that "the delivery of gas to a pipeline *is the normal function of a gatherer.* It is rare to find a case where a gathering facility *doesn't* deliver, ultimately, to a pipeline facility." 43 F.E.R.C. ¶ 61,305, at 61,845 (1988) (Commissioner Sousa, dissenting) (citation omitted).[14]

More recently, in *EP Operating Co. v. FERC*, 876 F.2d 46 (5th Cir.1989), the Fifth Circuit reversed FERC's denial of the gathering exemption upon finding the Commission could not explain its disparate treatment of the Green Canyon Line, the line at issue, from a similar line found to be nonjurisdictional. The court examined the application of the primary function test to two similar cases, both involving lines from Outer Continental Shelf (OCS) operations. The court noted that in the first cases, *Shell Gas Pipeline Co.*, 36 F.E.R.C. ¶ 61,317 (1986), and *Shell Gas Pipeline Co.*, 41 F.E.R.C. ¶ 61,032 (1987) (*Shell I & II*), the Commission rejected the mechani-

cal application of length and diameter standards, while in the *EP Operating* case, the Commission judged the line jurisdictional because of its length and diameter. The Commission also considered a sixth factor, the operating pressure of the line, which was not used in *Farmland.* Despite the Commission's characterization of the floating rig as the central point in the field, the court correctly noted that "this is only one factor to be considered. The true test of primary function is whether, with reference to the specific facts and circumstances of this particular line, its primary function is gathering." *Id.* at 49.[15]

Thus focusing on the specific facts and circumstances of the Green Canyon Line, the Fifth Circuit held that the fifty-one-mile line, the distance necessary to connect the point of production to the nearest interstate pipeline is "simply the most practical way to move the product from the seabed to a point nearer shore where it can be processed and introduced into a pipeline." *Id.* The Fifth Circuit also noted the geographic configuration of the lines was almost identical to that in *Shell I & II.* The court concluded, "The primary function of the Green Canyon Line is as [sic] an integral part of the natural gas gathering system for the Green Canyon area, and the line is exempt from Commission jurisdiction." *Id.* A reasoned analysis, the court observed, must eschew "the application of any overarching bright line standards." *Id.* at 48.

### B.

Although FERC's analytical framework provides a flexible method for evaluating a particular facility, we conclude FERC improperly applied its own test to the Piceance Basin facilities. Six subsystems are

---

**13.** In *Dorchester Gas Producing Co. v. FERC*, 848 F.2d 634, 637 (5th Cir.1988), the Fifth Circuit, reviewing a subsequent FERC order clarifying this order, 36 F.E.R.C. ¶ 61,049 (1986), observed that "the appropriate standard to be applied was evolving."

**14.** *See Locust Ridge*, 37 F.E.R.C. ¶ 61,295 (1986).

**15.** Since the central point is considered the place where all "gathered" gas is delivered into a

single line, gathering would be complete at that point "so that lines extending downstream from there are generally considered to be transportational lines." *EP Operating Co.*, 876 F.2d at 49. Noting that the Commissioner had not considered a central point in the field factor in *Shell I & II*, the court questioned the validity of this analysis for isolated OCS operations. *Id.*

at issue, three of which connect to Mountain Fuel's pipeline, and three to Northwest's pipeline. Of the first group, the Riverbend subsystem, for example, collects gas from twenty-three wells (1) which are scattered along the lines; (2) which have three- or four-inch diameters; (3) at low pressure; and (4) dehydration facilities are located at three points of interconnection in order to prepare the gas for later transmission in Northwest's high-pressure lines. Despite the other aspects of its configuration, the Commission found that Riverbend had no central gathering point and connected directly into Mountain Fuel's mainline.

In the second group of subsystems, North Douglas Creek, for example, gathers gas from eighty-five wells (1) dispersed throughout the producing area along the lines; (2) at low pressure; (3) located behind a processing plant; and (4) which serves as a central point. The Commission, adopting the findings of the ALJ, denied the exemption to North Douglas Creek without specifically detailing its characteristics. A third subsystem, Grand Valley, interlaces a producing area (1) connecting ninety-four wells; (2) with lines ranging in diameter from three inches to twelve inches; (3) at low pressure; and (4) the West Water Compressor Station collects gas and dehydrates it to prepare it for transmission in Northwest's mainline. Grand Valley's system was also denied the exemption without the Commission's explaining why its characteristics failed to satisfy the primary function test. Instead, the Commission stated that "the three facilities [North Douglas Creek, Grand Valley, and Foundation Creek] connected to Northwest's transmission system ... (1) these subsystems lack central gathering points; (2) they include compressor stations; and (3) that all three subsystems function as part of Northwest's interstate pipeline system." [16] In *Dorchester Gas Producing Co.*, 32 F.E.R.C. ¶ 61,409 (1985), however, the Commission judged the compression occurring in the field to be incidental to the gathering process and not intended for mainline transmission.[17]

The Commission not only failed to apply its own test but also ultimately trumped nonjurisdictional factors with jurisdictional factors. Indeed, the ALJ found, and the Commission agreed, that even if the configurations examined involved true gathering lines, "they would still be considered jurisdictional because of their primary transportation function." 38 F.E.R.C. ¶ 61,302, at 61,982. In support, the Commission cited *Continental Oil Co. v. FPC*, 266 F.2d 208 (5th Cir.), *cert. denied*, 361 U.S. 827, 80 S.Ct. 75, 4 L.Ed.2d 70 (1959), which stated that if a facility performs an exempt function as well as a jurisdictional function, FERC may exercise jurisdiction over the entire facility. However, *Continental Oil* expressly involved the production exemption.[18]

The Commission's orders state that the status of Northwest as an interstate pipeline company subject to its jurisdiction is one relevant factor to be included in its primary function analysis. Nevertheless, despite any possible showing that the facilities might perform gathering, the Commission would deem them jurisdictional because of the perceived primary transportation function; i.e., ultimately, the facilities are owned by and eventually connected to a company which *has as its primary function* the interstate transportation of gas.

■ By taking Northwest's status into consideration as one factor, the Commission has, in fact, subsumed the primary function analysis within that factor. However, Northwest's status in interstate transportation cannot alone transform the character of these particular facilities. Some transportation must occur to move the gas from the wellhead in some man-

**16.** Although Northwest asserts North Douglas Creek, Riverbend, and Grand Valley have central points, the Commission found otherwise.

**17.** Some of the Dorchester lines were 12 inches in diameter.

**18.** In *Continental Oil,* the Fifth Circuit specified, "Neither gathering nor facilities for gathering are in issue here; only facilities for production." 266 F.2d at 210.

ner.[19] What the Commission must decide in applying the primary function test is whether that transportation is incidental to traditional gathering functions and, thus, exempt from its jurisdiction.

Of equal concern is the broad reach of the result.[20] Although the analytical basis requires the Commission to consider the facts and circumstances of each facility, the Commission again submerges this particularized analysis in an extended discussion of FERC's broad national authority.[21] The Commission is correct that "Congress did not desire that an important aspect of this field be left unregulated."[22] *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 19, 81 S.Ct. 435, 445, 5 L.Ed.2d 377 (1961). However, at the same time, the Court added that "Congress did not desire comprehensive *federal* regulation; much authority was reserved for the States." *Id.*

There is no question that in section 1(b) Congress intended to distinguish between transportation in interstate commerce and "any other transportation" related to facilities for the production or gathering of natural gas. The Commission's announced intention to utilize the primary function test to evaluate these differences itself reinforces this distinction. However, the movement of gas alone from the wellhead cannot transform the services into interstate transportation. *See* 43 F.E.R.C. ¶ 61,305, at 61,845.

We share the Fifth Circuit's concern that the Commission has failed to provide a reasoned explanation for classifying these lines as jurisdictional. The gathering exemption was not meant to attach only to certain owners/operators but to facilities. If, as FERC maintains, the primary function test was intended to be more flexible, to avoid mechanical application of single factors, and to examine and weigh each element, the result must still be based on the calculation of these factors in this adjudication, not the Commission's perception of national regulatory policy. Indeed, although FERC may construct sound policy in this case, we do not believe it satisfies its own precedent or the intent of Congress.[23]

## IV. Regulatory Gap

As an additional ground for asserting jurisdiction, the Commission adopted the ALJ's conclusion that "the public interest requires a finding of jurisdiction because if the Commission did not regulate Northwest's gathering charges, a regulatory gap would be created." 38 F.E.R.C. ¶ 61,302, at 61,984. The Commission relies on *FPC v. Transcontinental Gas Pipeline Corp.*, 365 U.S. 1, 28, 81 S.Ct. 435, 449–50, 5 L.Ed.2d 377 (1961) (*Transco*). In resolving borderline cases not covered by explicit congressional authority, the *Transco* Court

---

**19.** In *Hamman v. Southwestern Gas Pipeline*, 721 F.2d 140 (5th Cir.1983), a case involving the Natural Gas Pipeline Safety Act, the court noted that the regulations accompanying this act define a gathering line as "a pipeline that *transports* gas from a current production facility to a transmission line or main." 49 C.F.R. § 192.3 (emphasis added).

**20.** During oral argument, Commission counsel was asked to give an example of an interstate pipeline performing gathering services that is not or would not be subject to the Commission's jurisdiction. Counsel ventured the example of a noncontiguous pipeline. In a subsequent clarification to the court, FERC's counsel stated, "The Commission's position in this case is that the service of moving natural gas in interstate commerce for hire by an interstate pipeline company, the rates charged and conditions for that service, and *the facilities* through which that service is performed are subject to the

Commission's jurisdiction under the Natural Gas Act." Letter from the Office of the General Counsel of FERC dated January 24, 1990, (emphasis added).

**21.** In its brief, the Commission states, "[W]hat is at stake in this proceeding is the Commission's ability to carryout [sic] its statutory mandate by fostering wellhead competition in a national commodity market through an open, unified national gas transportation network."

**22.** The Commission's brief misquotes this sentence stating "any important aspect." *See* Respondent's brief at 19.

**23.** Until FERC resolves this question, we do not consider its alternate argument that sections 4(a) and 5 of the NGA, 15 U.S.C. §§ 717c(a) and 717d respectively, provide another mechanism for asserting jurisdiction to review the rates charged.

explained, "we must ask whether state authority can practically regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." [24] *Id.* at 19–20, 81 S.Ct. at 445. If "by its very nature" the problem is not "one with which state regulatory commissions can be expected to deal, the conclusion is irresistible that Congress desired regulation by federal authority rather than nonregulation." *Id.* at 28, 81 S.Ct. at 450.[25]

The Commission asserts that neither Colorado nor Utah, the states in which the Piceance Basin facilities are located, are interested in regulating the charges because the gas is consumed in other states; and even if they chose to regulate, they would be obliged to promote first their state interests, contravening FERC's statutory mandate to foster national wellhead competition. Although California, through the California Public Utilities Commission (CPUC), can review the rates PG & E paid to NGC and passed on to its consumers, the Commission asserts this indirect regulation, based on a "prudency" standard, is ineffective and would ultimately lead to a hodgepodge of individual gathering rates.[26]

In support of this theory, the Commission relies on *Public Service Comm'n v. FERC*, 610 F.2d 439 (6th Cir.1979), which held that FERC's jurisdiction includes the movement of natural gas from the wellhead through gathering lines owned by an interstate pipeline. The case, however, is inapposite. In *Public Service*, Kentucky gave a statutory preference to intrastate purchasers of certain interstate gas. As the court distinguished in *City of Farm-*

*ington v. FERC*, 820 F.2d 1308, 1314 (D.C. Cir.1987), the preference diverted sales of gas from *"preexisting* interstate sales— over which the Commission clearly had jurisdiction—to serve local consumers." (citation omitted).

■ If, upon proper application of the primary function test, the facilities are indeed exempt from Commission jurisdiction, whatever "attractive gap" results was clearly created by Congress. Jurisdiction must already exist before the Commission can resort to analyzing its regulatory role by application of this theory. Moreover, in other cases, FERC has approved the indirect regulation of gathering facilities, *see, e.g., Galaxy Energies, Inc.*, 21 F.E.R.C. ¶ 61,208 (1982); and its assertion that Colorado and Utah have no interest or an adverse interest in this regulation is speculative. In either case, on this record, the "attractive gap theory" is inappropriate to fill the void. The facilities are either gathering and exempt from Commission jurisdiction, or transportation and subject to jurisdiction.

## V. Conclusion

Because we believe the Commission improperly applied its own test and failed to hinge its result to the particular facts of this case, we REVERSE its decision in Opinion Nos. 270 and 270–A. This conclusion obviates the need to address Northwest's contention that FERC's disposition denies it and other interstate pipelines the equal protection of the laws. The case is, therefore, REMANDED for a determina-

---

**24.** In *Transco,* the Court held the Commission could deny certification based on the proposed end use for the gas, which considered the proposed inferior use in industrial boilers as opposed to use by domestic consumers, preemption of pipeline facilities for this inferior use, and price.

**25.** In their brief in support of FERC, intervenors, PG & E and NGC state that FERC's jurisdiction over these facilities was clearly established in *Interstate Natural Gas Co. v. FPC,* 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742, *reh'g denied,* 332 U.S. 785, 68 S.Ct. 30, 92 L.Ed. 368 (1947). *Interstate,* however, addressed the issue of whether the FPC, FERC's predecessor, had jurisdiction in the first instance over the sales of

gas in interstate commerce from petitioner's wells transported through petitioner's lines. Both the regulatory setting and the facts are inapposite. Indeed, *Interstate* reaffirmed the States' "full freedom" to regulate the physical production and gathering of natural gas. *Id.* at 690, 67 S.Ct. at 1487.

**26.** Intervenors, ANR Pipeline and Colorado Interstate Gas Company, contend that FERC's attractive gap argument seeks to "envelop gathering services provided by interstate pipelines within the fold of Order No. 436." Intervenor Questar Pipeline Company urges we reject these generic, policy-based grounds for a fact-specific analysis.

tion whether the facilities at issue are properly exempted from FERC's jurisdiction on the ground that they perform gathering functions as defined in section 1(b).

